LOGGED — RECEIVED

GDB/EBP: USAO 2017R00685

AUG 1 4 2019

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
DEPUTY



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **FILED UNDER SEAL** |
| | * | |
| **ANTHONY KENNETH DOTSON JR.,** | * | CASE NO. 19 - 2669 - CBD |
| a/k/a "Streetz," | * | |
| a/k/a "Ghost," | * | CASE NO. 19 - 2670 - CBD |
| a/k/a "Rico," | * | |
| **MARVIN WINDELL GRAY,** | * | CASE NO. 19 - 2671 - CBD |
| a/k/a "Marv," | * | |
| **JAMES ANTHONY HARVEY JR.,** | * | CASE NO. 19 - 2672 - CBD |
| a/k/a "Fat Bread," | * | |
| a/k/a "Patches," | * | CASE NO. 19 - 2673 - CBD |
| **MARCELLUS JEROME WOODLAND,** | * | |
| a/k/a "Cellus," | * | |
| **TIARA MACKALL,** | * | |
| a/k/a "Tee," | * | |
| | * | |
| **Defendants** | * | |
| | ******* | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS AND ARREST WARRANTS

I, Mark D. Howard, a Task Force Officer with the Drug Enforcement Administration

("DEA"), being duly sworn, depose and state that:

### INTRODUCTION

1.    Your affiant is a law enforcement officer of the United States within the meaning

of 18 U.S.C. § 2510(7).

2.    Based on the facts alleged in this affidavit, there is probable cause to believe that,

on dates specified below, in the District of Maryland and elsewhere, the following individuals and



others have and are violating 21 U.S.C. § 846 (conspiracy to distribute controlled substances) and

21 U.S.C. § 841 (possession with intent to distribute and distribution of controlled substances):

a.   **ANTHONY KENNETH DOTSON Jr.**, a/k/a "Streetz," "Ghost," and "Rico" ("**DOTSON**").

b.   **MARVIN WINDELL GRAY**, a/k/a "Marv" ("**GRAY**").

c.   **JAMES ANTHONY HARVEY Jr.**, a/k/a "Fat Bread" and "Patches" ("**HARVEY**").

d.   **MARCELLUS JEROME WOODLAND**, a/k/a "Cellus" ("**WOODLAND**").

e.   **TIARA MACKALL**, a/k/a "Tee" ("**MACKALL**").[1]

3.   Your affiant is contemporaneously submitting applications for authorization to

search eight **Target Locations** (identified in this affidavit as **Target Location 1** through **Target**

**Location 8**).[2]

## AGENT TRAINING AND EXPERIENCE

4.   I am a Task Force Officer, deputized with the DEA and a Detective with the St.

Mary's County Sheriff's Office ("SMCSO").[3] I am presently assigned to the DEA Task Force

Group, Southern Maryland Drug Initiative, and have been working with the DEA for a period of

sixteen years. Prior to being assigned to the DEA Task Force, I was a detective assigned as a

---

[1]   This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of your affiant's knowledge about this investigation.

[2]   For clarity, the target defendants are capitalized and bold (e.g., **ANTHONY DOTSON**), and target locations and intercepted phones are lower case and bold (e.g., **Target Location 1** and **Target Telephone 1**).

[3]   Unless otherwise stated, all counties refer to counties in Maryland.

2



narcotic investigator with the SMCSO for three years, and worked for the SMCSO for over twenty years.

5.      I have been a Maryland Police Training Commission Certified Police Officer since 1986. As a narcotics investigator, I have initiated and participated in numerous drug investigations. I have received training from the Prince George's County Police ("PGPD") Academy in basic criminal investigation and in narcotics investigation, and have completed the DEA's two-week Basic Drug Investigator's School, Task Force Officer's School and Advanced Narcotics Investigators School. I also completed the Telecommunications Interceptions School conducted by the National Intelligence Academy, Managing Confidential Informants School conducted by the Criminal Justice Management Group, the Street Crimes and Surveillance School conducted by John Reid and Associates, and the Narcotics/Terrorism Class conducted by the Northeast Counter Drug Training Center. I have previously been involved in five Title III wiretap investigations where I was the affiant on the Title III Affidavits and also have been involved in numerous Title III wiretap investigations in the District of Maryland, Southern Division, in both a surveillance and phone call monitoring capacity. I have completed the Title III and state wiretap training conducted by the Washington/Baltimore High Intensity Drug Trafficking Area training cadre.

6.      I have been the lead investigator in a number of Organized Crime Drug Enforcement Task Force ("OCDETF") investigations concerning drug trafficking organizations and violent street gangs involved in the distribution of various controlled substances, including heroin, fentanyl, cocaine hydrochloride and cocaine base or "crack" cocaine, phencyclidine ("PCP"), MDMA ("ecstasy"), marijuana and weapons to include handguns and rifles. As a result, I have voluminous experience in debriefing criminal defendants, witnesses, and other persons with

3



direct experience in the methods used to distribute controlled substances.

7.       I have actively taken part in the purchase of various controlled substances and weapons, either by using confidential sources, undercover agents, or acting in an undercover capacity. Additionally, when acting in an undercover capacity, I have purchased cocaine, cocaine base ("crack"), marijuana, LSD, assault rifles and handguns. I have participated in hundreds of hours of surveillance of drug and weapon traffickers and observed countless "hand to hand" drug transactions as well as weapons purchases. Through these investigations, I have direct knowledge of the concealment methods utilized by drug and weapons traffickers, to include the use of "stash" houses and locations utilized by drug traffickers to conceal their contraband.

8.       As both an affiant and participant in prior Title III investigations, I have become familiar with the use of cell phones by narcotics traffickers to communicate, the patterns of activity of narcotics traffickers, the types and amounts of profits typically made by narcotics traffickers, and the methods, language, and terms used to disguise the source and nature of the profits obtained from narcotics trafficking.

9.       In addition, from my training and experience, I have learned that it is common for narcotics traffickers: (1) to "front" (or provide on consignment) controlled substances to their customers, (2) to conceal contraband, proceeds of narcotics sales, and records of narcotics transactions in secure locations within their residences, vehicles and/or their businesses for ready access, (3) to conceal proceeds from law enforcement authorities and rival narcotics traffickers, (4) to routinely use digital display cell phones and text messaging to facilitate their drug distribution operations, and (5) to use firearms to protect their drugs, protect their drug proceeds, intimidate witnesses and rival drug dealers, and maintain their positions as drug dealers.

4



10.     I have also learned that narcotics-trafficking is an ongoing process, requiring the development, use, and protection of a communication network to facilitate daily narcotics distribution, and as such, narcotics traffickers commonly use coded language when speaking with other narcotics traffickers, use multiple cell phones, and frequently change their cell phone numbers in order to thwart detection by law enforcement agents who may be intercepting or attempting to intercept their communications. As a result of my training, experience and knowledge, I have been recognized as an expert in drug trafficking and the use of "coded" language utilized by drug traffickers in the United States District Court, District of Maryland.

## PROBABLE CAUSE

11.     Beginning around February 2017, the DEA, PGPD, and the Charles County Sheriff's Office ("CCSO") began an investigation into the heroin and fentanyl trafficking activities of **DOTSON**, who was operating primarily in Prince George's County and Charles County. During the investigation, your affiant learned that **DOTSON** maintains a supervisory role in a drug trafficking organization that utilizes multiple cell phones (or "burner phones") to conduct its drug trafficking activities. Additionally, your affiant learned that **DOTSON** employs runners who sell fentanyl and heroin on **DOTSON**'s behalf.

12.     Confidential Source 1 ("CS1") informed law enforcement that **DOTSON** normally provided CS1 with a phone number to contact **DOTSON** so that CS1 could purchase heroin, and that **DOTSON** at times sent runners to sell heroin on **DOTSON**'s behalf.[4] CS1 subsequently identified **GRAY** and **HARVEY** as members of the **DOTSON** drug trafficking organization. CS1

---

[4] Confidential sources and other civilian witnesses are referred to using male pronouns, regardless of gender.



thereafter conducted controlled purchases of fentanyl and heroin from **DOTSON** and other members of the drug trafficking organization.[5]

13.     Confidential Source 2 ("CS2") provided information concerning **DOTSON**'s drug trafficking activities and said that he had been purchasing five-gram quantities of heroin from **DOTSON** since approximately November 2018. CS2 identified several of **DOTSON**'s coconspirators, said that **DOTSON** wanted CS2 to increase the quantity of heroin CS2 was purchasing from **DOTSON**, and that CS2 observed **DOTSON** with a quantity of heroin that was "broken down" into one-gram, five-gram, and 10-gram quantities for sale. Law enforcement utilized CS2 to conduct controlled purchases of fentanyl and heroin from **DOTSON** (as more fully described below).

14.     As a result of the investigation, the Honorable United States District Judge Paul W. Grimm signed an order authorizing the interception of wire and electronic communications occurring over **DOTSON**'s cell phones—**Target Telephone 1** and **Target Telephone 2**. The interceptions verified that **DOTSON, GRAY, HARVEY, WOODLAND, MACKALL**, and others are engaged in a large fentanyl and heroin trafficking organization in the Southern Maryland region. Moreover, interceptions revealed that **DOTSON** is utilizing multiple sources of supply for fentanyl, heroin, and cocaine.

---

[5] All of the controlled purchases described in this affidavit were conducted under the direction of law enforcement. In every instance, law enforcement searched the confidential sources for contraband prior to and immediately after the transactions. Law enforcement also provided the confidential sources with official authorized funds to conduct the transactions, and kept the confidential sources under constant surveillance during the transactions. Moreover, the confidential sources were equipped with devices to record the transactions. After the controlled purchases, officers debriefed the confidential sources.



*Target Location 1*

15.     Your affiant and other officers learned through extensive surveillance that **Target Location 1** is **DOTSON**'s primary residence, and that **DOTSON** lives at this location with his paramour, Individual 1. Your affiant has observed **DOTSON**, Individual 1, and a small male child at **Target Location 1** on numerous occasions. Further, on April 8, 2019, **DOTSON** provided **Target Location 1** as his address of record to CCSO officers who were investigating a domestic disturbance in Waldorf, Maryland.

16.     On January 23, 2019 at approximately 7:15 a.m., your affiant and other officers established surveillance at **Target Location 1**. At approximately 8:30 a.m., **DOTSON** and a small child exited the residence and got into a silver Nissan sedan with Maryland tag 2DH7722 ("the Nissan") that was parked in the driveway of **Target Location 1**.

17.     At approximately 9:00 a.m., CCSO detectives met with CS1 for the purpose of conducting a controlled purchase of heroin from **DOTSON**. CS1 stated that **DOTSON** provided him with the cell phone number 202-270-7045 as **DOTSON**'s contact number. CS1 placed a consensually recorded call to 202-270-7045 and spoke to **DOTSON**. During the call, CS1 requested a $100 quantity of heroin. **DOTSON** instructed CS1 to go to the Bank of America parking lot located on Crain Highway, Waldorf, Maryland to conduct the transaction. CS1 then met **DOTSON** in the Bank of America parking lot and exchanged $100 for a quantity of heroin. **DOTSON** was operating the Nissan and was the sole occupant of the vehicle.

18.     Immediately after the transaction, CS1 provided the suspected heroin he obtained from **DOTSON** to a CCSO detective. The suspected heroin was subjected to a Tru-Narc Thermo Scientific Analyzer field test. The results of the field test were positive for the presence of heroin.



19.     Law enforcement reviewed the video footage that was recovered from the recording device affixed to CS1 during the transaction, which depicted **DOTSON** during the controlled purchase. Further, your affiant learned through MVA and subpoenaed records from Enterprise Leasing that Individual 1 rented the vehicle **DOTSON** was operating during the transaction, and that Individual 1 provided **Target Location 1** as her address to Enterprise Leasing.

20.     On April 9, 2019 at approximately 8:00 a.m., your affiant and other officers established surveillance at **Target Location 1**. At approximately 8:34 a.m., officers observed **DOTSON** and a small child exit **Target Location 1**. Both **DOTSON** and the small child entered a white 2014 Chevrolet Silverado with Washington, DC tag FN6004 ("the Silverado"). **DOTSON** then traveled to the intersection of Sweetgum Way and Clinton Way, where your affiant observed the small child get out of the Silverado and board a Prince George's County school bus.

21.     Officer's maintained surveillance of **DOTSON**, and at approximately 9:33 a.m., **DOTSON** arrived at **Target Location 2**—Everyday Automotive—which is **DOTSON**'s business location. **DOTSON** used a key to enter the front door of **Target Location 2**.

22.     At approximately 9:35 a.m., CCSO detectives met with CS2, who sent a text message to **DOTSON** at cellular number 240-270-4092 requesting a $400 quantity of heroin. **DOTSON** responded by instructing CS2 to meet **DOTSON** at the Giant store located on Crain Highway, Waldorf, Maryland. At approximately 9:44 a.m., **DOTSON** departed from **Target Location 2** in the Silverado. Officers maintained surveillance of **DOTSON** as he travelled to the parking lot of the Giant store.

23.     At approximately 9:54 a.m., **DOTSON** met with CS2 in the parking lot of the Giant store. CS2 entered the passenger side of the Silverado. **DOTSON** and CS2 had a conversation,

8



and **DOTSON** exchanged a quantity of heroin for $400 that CS2 provided to **DOTSON**. CS2 then exited the Silverado, and **DOTSON** left the area. Immediately after the controlled buy, CS2 met with and provided CCSO detectives with the suspected heroin CS2 purchased from **DOTSON**. The suspected heroin was submitted to the DEA Mid-Atlantic Laboratory for analysis. The results of the analysis revealed that the substance was approximately 4.8 grams of fentanyl.

24.     On May 9, 2019 at approximately 8:00 a.m., your affiant and other officers established surveillance at **DOTSON**'s residence (**Target Location 1**). At approximately 10:43 a.m., **GRAY** arrived at **Target Location 1** operating a brown Chevrolet Tahoe with Virginia tag UXU7683 ("the Tahoe"). **GRAY** exited the Tahoe and went inside **Target Location 1**. At approximately 11:00 a.m., both **GRAY** and **DOTSON** exited **Target Location 1**, and at approximately 11:06 a.m. departed **Target Location 1** with **DOTSON** operating the Tahoe and **GRAY** in the front passenger seat. Your affiant and other officers maintained surveillance of **DOTSON** and **GRAY** as the two subsequently traveled into Charles County.

25.     That day (May 9, 2019), CCSO detectives met with CS2, and at approximately 10:27 a.m., CS2 placed a consensually recorded call to **DOTSON** at 301-609-1755. During the call, **DOTSON** asked "What you getting?" CS2 replied "the six." **DOTSON** and CS2 then agreed to meet at the food court of the St. Charles Towne Center located in Waldorf, Maryland to conduct a drug transaction. Your affiant believes that when **DOTSON** asked "What you getting,"



**DOTSON** was asking CS2 for the quantity of heroin CS2 wanted.[6] When CS2 replied "the six,"
CS2 was requesting a $600 quantity of heroin from **DOTSON**.

26.     At approximately 12:18 p.m., your affiant and other officers observed **DOTSON**
and **GRAY** arrive in the St. Charles Towne Center parking lot. **DOTSON** was operating the Tahoe
and **GRAY** was in the passenger seat. **DOTSON** pulled up to the food court area of the shopping
center, and CS2 entered the rear passenger seat of the Tahoe. At law enforcement's direction, CS2
then used $600 to purchase a quantity of heroin from **DOTSON**. After the transaction, CS2 met
with CCSO detectives and your affiant, and provided the heroin he purchased from **DOTSON**.
CS2 was debriefed, and identified **DOTSON** as the driver and **GRAY** as the passenger of the
vehicle. The suspected heroin was submitted to the DEA Mid-Atlantic Laboratory for analysis.
The analysis revealed that the heroin was 4.82 grams of heroin and fentanyl.

27.     On June 13, 2019 at approximately 11:15 a.m., **Target Telephone 1** received an
incoming call (Call 950) from 443-254-0881, a phone utilized by UM0881.[7] The following is a
draft transcript of the call between **DOTSON** and UM0881.[8]

> **DOTSON**:     I'm good right now. I got 14 of this raw shit left. I've been trying to get in
> touch with my man for the last three days. I ain't going to lie to you brother,
> his shit best. But of course, I got to go back to the next best thing, I know
> which is you. I, this nigga just came in and it was just like a, a blessing. I
> ain't gonna lie, this shit is raw, untouched. But again, I mean the best next

---

[6] The facts, conclusions, and beliefs I express in this affidavit are based on my training, experience,
knowledge of the investigation, and reasonable inferences I've drawn from my training,
experience, and knowledge of the investigation.

[7] Unidentified males and females are described as "UM" or "UF" followed by the last four digits
of the caller's phone number.

[8] All transcripts in this affidavit are in draft form and are subject to revision.



thing I know that can . . .

UM0881:     Alright, just let me know, in case you dry, in case you dry, hit me.

**DOTSON**:     Alright, as soon as that shit gone, I got you.

UM0881:     Alright, bet.

28.     Your affiant believes that when **DOTSON** said "I got 14 of this raw shit left,"

**DOTSON** was using coded language to describe having 14 grams of fentanyl left in his current

supply. Further, when **DOTSON** said "I ain't going to lie to you brother, his shit best. But of

course, I got to go back to the next best thing, I know which is you," **DOTSON** was telling

UM0881 that **DOTSON**'s primary source of supply had a good product, but that **DOTSON** could

not get in touch with the source ("been trying to get in touch with my man for the last three days")

and that UM0881 was **DOTSON**'s secondary source of supply ("next best thing"). Your affiant

further believes—based on UM0881's reply ("Alright, just let me know, in case you dry, in case

you dry, hit me")—that UM0881 was prepared to resupply **DOTSON**.

29.     On June 16, 2019, beginning at approximately 3:03 p.m., **Target Telephone 1**

exchanged the following text messages with UM0881:

| Time | Call Number | Direction[9] | Text Message |
|------|-------------|------------|--------------|
| 3:03 p.m. | 2700 | Outgoing | Come to me tomorrow am ok need fetty bruh |
| 3:03 p.m. | 2701 | Outgoing | I'm have 1100 for half |
| 3:04 p.m. | 2702 | Incoming | Ok |
| 9:10 p.m. | 2828 | Outgoing | Early bruh like 8 |
| 9:10 p.m. | 2829 | Outgoing | Same spot |

---

[9] Throughout this affidavit, the direction of the communication relates to the target phone. For
example, in this table, **Target Telephone 1** received the text messages marked as "incoming" and
sent the text messages marked as "outgoing."



30.    Your affiant believes that when **DOTSON** texted UM0881 "Come to me tomorrow am ok need fetty bruh . . . I'm have 1100 for half," **DOTSON** was requesting a half ounce of fentanyl ("fetty") from UM0881. Your affiant knows the current price range for a one-gram quantity of fentanyl in the Washington, DC-Maryland area is approximately $75 to $120. Additionally, your affiant believes—based on the text "Same spot" (Call 2829)—that **DOTSON** and UM0881 have previously met at this predetermined location.

31.    On June 17, 2019 at approximately 8:41 a.m., **Target Telephone 1** placed a call to 443-254-0881. During the conversation, UM0881 said "I'm ready to shoot out there now, in like twenty minutes." **DOTSON** said "Alright, bet." UM0881 said "Iverson Mall?" **DOTSON** said "Yeah." Based on this call, officers set up surveillance at **Target Location 1** in anticipation of the pending meeting between UM0881 and **DOTSON**.

32.    At approximately 10:10 a.m., officers observed **DOTSON** exit **Target Location 1** and enter the Silverado. Officers maintained surveillance of **DOTSON** as he traveled to Iverson Mall, located on Branch Avenue, Hillcrest Heights, Maryland. Officers then observed **DOTSON** pull into the Bojangles restaurant located in the Iverson Mall parking lot in Temple Hills, Maryland.

33.    At approximately 11:07 a.m., **Target Telephone 1** placed an outgoing call (Call 3105) to 443-254-0881. During the conversation, **DOTSON** said "What you driving?" UM0881 replied "I'm in a blue Malibu right behind this gold Lexus." **DOTSON** then said "I see you now."

34.    At approximately 11:09 a.m., officers observed a black male exit the driver's door of a blue Chevrolet Malibu 4-door sedan with Maryland tag 6DT3866 ("the Malibu"). The black male entered the passenger side of **DOTSON**'s Silverado. Less than one minute later, the black

12



male exited the passenger side of **DOTSON**'s Silverado and got back into the driver's seat of the Malibu. Both **DOTSON** and the black male then departed the parking lot in their respective vehicles.

35.     Your affiant believes that **DOTSON** and UM0881 met for the purpose of conducting a drug transaction. Your affiant knows that the actions of the black male and **DOTSON** (one drug dealer entering the vehicle of another drug dealer for a short period of time in a neutral location) are consistent with the completion of a drug transaction.

36.     On June 18, 2019 at approximately 4:02 p.m., **Target Telephone 1** sent an outgoing text message (Call 4029) to UM0881 that read "Same thing bruh am." At approximately 5:00 p.m., **Target Telephone 1** placed an outgoing call (Call 4069) to 443-254-0881. During the call, **DOTSON** said "Yeah, you in town, or you out your way?" UM0881 said "I'm out my way right now." **DOTSON** said "You coming this way?" UM0881 said "Yeah, probably later." **DOTSON** said "What time?" UM0881 said "Probably like eight." **DOTSON** said "Alright, bring that with you, bring that, I'm ready." UM0881 said "Alright, bet, alright."

37.     Your affiant believes that when **DOTSON** texted UM0881 "Same thing bruh am," **DOTSON** was using coded language to tell UM0881 that **DOTSON** needed another 14-gram quantity of fentanyl. Further, when **DOTSON** told UM0881 "bring that with you, bring that, I'm ready," **DOTSON** was telling UM0881 that **DOTSON** was ready to purchase narcotics.

38.     On June 18, 2019 at approximately 7:36 p.m., **Target Telephone 1** received an incoming call (Call 4205) from 443-254-0881. **DOTSON** answered the call and said "Talk to me money." UM0881 said "I'm getting ready to shoot out there right now." **DOTSON** said "Alright, bet, that's what I like to hear, say no more." Based on this call, surveillance officers responded to

13



the parking lot of the Bojangles restaurant located in the Iverson Mall parking lot in Temple Hills, Maryland. At approximately 8:35 p.m., an officer observed **DOTSON** arrive in the parking lot operating the Silverado.

39.   At approximately 8:38 p.m., a dark colored Hyundai 4-door sedan ("the Hyundai") with Maryland tag 9CZ1543 pulled into a parking space next to **DOTSON**'s Silverado. A black male exited the driver's seat of the Hyundai and got into the passenger side door of **DOTSON**'s Silverado. At approximately 8:40 p.m., the black male exited **DOTSON**'s Silverado and opened the driver's door of the Hyundai. Your affiant believes that **DOTSON** and UM0881 (or a coconspirator working with UM0881) met for the purpose of conducting a drug transaction. For the reasons described above, this meeting exhibited the characteristics of a parking lot drug transaction in **DOTSON**'s Silverado. After the transaction, officers maintained surveillance of **DOTSON** as he travelled back to **Target Location 1**.

40.   On July 30, 2019 at approximately 11:24 a.m., **Target Telephone 1** received an incoming call (Call 9955) from 301-260-5589, a phone utilized by **MACKALL** (one of **DOTSON**'s drug runners). The following is a draft excerpt from the call where **DOTSON** explains his drug business to **MACKALL**.

> **DOTSON**:   That's what I'm saying when you there, look, that's how you got to work it, how I work this shit, I be in storage one week, alright, or at least for real, storage my main like, start stashing my money, little bullshit there for real, over there I mean, however you look at it with the mixer, blender, you can have that literally right there in plain view, with nobody touching it because you only what it is, you feel me? You get what I'm saying?

> **MACKALL**: Yeah.

> **DOTSON**:   I mean I do it right now at my shop, I'm being real, right now at my house, I have one there, I have one at my spot, and I have one in storage, when I,



> when niggas here and I know I can't do what I want to do cause so many people around I go hit my storage joint, if I'm up at the spot and I'll be like alright fuck it, I know I got to grab bags real fast so I'll only grab one pack and one pack, you feel what I'm saying? That way I know at the end of the day I can put some quick shit together real fast and keep the flow going. I got a good thing going right now, I ain't gonna lie. You heard me?

41.    Your affiant believes **DOTSON** is telling **MACKALL** where he keeps his drug paraphernalia that he uses to prepare fentanyl and heroin. Specifically, when **DOTSON** said "the mixer, blender, you can have that right there in plain view, with nobody touching it because you only what it is," **DOTSON** referred to using a mixer and blender to mix fentanyl and heroin with cutting agents. When **DOTSON** said "right now at my house, I have one there, I have one at my spot, and I have one in storage, when I, when niggas here and I know I can't do what I want to do," **DOTSON** referred to keeping his drugs and drug preparation paraphernalia at different locations, specifically at his house (**Target Location 1**) and alternative locations **DOTSON** uses to prepare his drug mixture, including the "shop" (**Target Location 2**) and "storage" (**Target Location 3**).

### *Target Location 2*

42.    **DOTSON** maintains a business identified as Everyday Automotive located at **Target Location 2**—an end unit in a row of businesses that is situated in an industrial park. **Target Location 2** has a garage bay and a front door leading to a small office space. Your affiant and other officers have conducted extensive surveillance at this location and have a covert camera installed in an adjacent parking lot to assist in covertly viewing **Target Location 2**. Your affiant and other officers have observed **DOTSON**, **GRAY**, and **HARVEY**, as well as vehicles those subjects operate, on almost a daily basis coming and going from **Target Location 2**. Your affiant



has also observed **DOTSON** on numerous occasions unlock the front door to **Target Location 2** using a key. Further, on April 12, 2019, an individual called the CCSO and complained that the employees of Everyday Automotive are selling drugs.

43.     Your affiant knows from Maryland State Department of Assessments and Taxation records ("SDAT") that Everyday Automotive is registered to one of **DOTSON**'s family members. As of December 21, 2017, the business registration reflects the address for a church in Clinton, Maryland.

44.     On May 21, 2019, your affiant established surveillance at **Target Location 1**. At approximately 9:05 a.m., your affiant observed **DOTSON** exit **Target Location 1** with a small child and get into a gray Ford F-150 with Maryland tag 7DT4286 ("the Ford truck"). Your affiant observed **DOTSON** drive to an elementary school and drop off the small child. Your affiant subsequently observed **DOTSON** arrive at and enter **Target Location 2**.

45.     Your affiant and CCSO detectives then met with CS2. CS2 stated that on May 16, 2019, he received a text message from **Target Telephone 1** that stated in all capital letters, "GOOD MORNING." CS2 told your affiant that this is **DOTSON**'s code to mean that **DOTSON** is ready to conduct drug trafficking activities. CS2 further stated that due to the fact the text was in all capital letters, CS2 believed this to be **DOTSON**'s new cell phone number.[10]

46.     On May 21, 2019 at approximately 9:24 a.m., CS2 received two text messages from **Target Telephone 1** that read "GM" and "Flameback." CS2 told your affiant that "GM" meant

---

[10] Your affiant has since corroborated CS2's information through interceptions occurring over **Target Telephone 1**. On almost a daily basis, **DOTSON** sends out a text message reading "GM" or "Good Morning" to his drug customers, which is coded language to inform the customers that **DOTSON** is ready to distribute fentanyl and heroin.



"Good Morning" and "Flameback" was coded language **DOTSON** utilized to convey that **DOTSON** had a potent quantity of heroin. Your affiant viewed the text messages on CS2's cell phone, and your affiant confirmed that the text messages were sent from **Target Telephone 1**. At approximately 10:14 a.m., law enforcement instructed CS2 to send a text message to **Target Telephone 1** requesting a $200 quantity of heroin from **DOTSON**. The text message read "Hey bruh I got two bills."

47.    At approximately 10:24 a.m., law enforcement instructed CS2 to place a consensually monitored and recorded call to **Target Telephone 1**. CS2 placed the call to **Target Telephone 1**. During the conversation, CS2 told **DOTSON** "I got two bills." **DOTSON** instructed CS2 to "meet at the mall." When CS2 told **DOTSON** "I got two bills," CS2 was requesting a $200 quantity of heroin from **DOTSON**.

48.    At approximately 10:18 a.m., officers observed **DOTSON** and **GRAY** depart from **Target Location 2**. **DOTSON** was operating the Ford truck with **GRAY** in the front passenger seat. At 10:40 a.m., **Target Telephone 1** sent a text message to CS2. The text message read "Food court." At approximately 10:43 a.m., CS2 sent a text message to **Target Telephone 1** stating "Ok I'm out front of food court."

49.    At approximately 10:47 a.m., your affiant and other officers observed **DOTSON** and **GRAY** arrive in the St. Charles Towne Center parking lot operating the Ford truck. **DOTSON** drove to the front of the food court and CS2 entered the rear passenger door of **DOTSON**'s truck. **DOTSON** then drove to the front of the Kohl's Department Store and parked briefly in a handicapped parking space. In the truck, CS2 provided $200 to **DOTSON** in exchange for a quantity of heroin. **DOTSON** then dropped CS2 off in front of the food court.



50.     Your affiant and CCSO detectives met with CS2, who provided law enforcement with two small clear plastic zip-lock bags containing suspected heroin that he purchased from **DOTSON**. Your affiant and CCSO detectives debriefed CS2, who stated that **DOTSON** handed him the suspected heroin and that **GRAY** received the $200 from CS2. The suspected heroin was submitted to the DEA Mid-Atlantic Laboratory for analysis. The analysis revealed that the substance was 1.09 grams of fentanyl and heroin.

### *Target Location 3*

51.     Economy Storage of Waldorf owns and operates **Target Location 3**. Your affiant knows—based on business records obtained from Economy Storage, intercepted calls, and surveillance—that **DOTSON** had **HARVEY** (one of **DOTSON**'s runners) rent storage Unit 683 (**Target Location 3**) in **HARVEY**'s name. Based on surveillance, your affiant knows that **DOTSON** previously had a storage unit at a facility located on Industrial Park Drive, Waldorf, Maryland. Based on intercepted calls and surveillance, your affiant believes that **DOTSON** utilizes **Target Location 3** as a stash and drug preparation location.

52.     On July 24, 2019 at approximately 11:50 a.m., **Target Telephone 2** (one of **DOTSON**'s cell phones) placed an outgoing call (Call 1607) to 240-377-6157, a phone utilized by **HARVEY**. The following is a partial draft transcript of the conversation between **DOTSON** and **HARVEY**.

> **HARVEY**:    Hello?
>
> **DOTSON**:    So this is what we gonna do I need you here tomorrow, I ain't really need you too much today for real, but tomorrow I definitely need you, nine o'clock, I mean I can use you today, but it's little tedious shit for real, I would like to change the storage and shit like that, you know what I'm saying? Where I got the boys in. We got haircuts tomorrow at three o'clock,

18



um, but I got Copperhead gonna come, so we can do the car and start fucking with the car.

**HARVEY**:    When tomorrow?

**DOTSON**:    Yeah.

**HARVEY**:    Alright.

**DOTSON**:    Alright? And you come over here today, I got uh, knock this storage out, cause, got another little storage I can get, you know what I'm saying? But I ain't paying this once, I ain't paying this motherfucker two-eighty, when I'm only paying one-seventy, one, one-sixty or some shit. You heard me?

**HARVEY**:    Yeah.

53.    Your affiant believes that when **DOTSON** said "I would like to change the storage and shit like that, you know what I'm saying? Where I got the boys in," **DOTSON** was using coded language to tell **HARVEY** that he intended to change his storage or stash location ("where I got the boys in"). Your affiant knows that "boy" is a common street term used to describe heroin.

54.    On July 29, 2019 at approximately 12:24 p.m., **Target Telephone 2** placed an outgoing call (Call 2468) to 240-377-6157, a phone utilized by **HARVEY**. The following is a draft transcript of the call between **DOTSON** and **HARVEY**.

**HARVEY**:    Hello?

**DOTSON**:    You went to the right one?

**HARVEY**:    Yeah.

**DOTSON**:    Oh, what they doing?

**HARVEY**:    Filling out the paperwork.

**DOTSON**:    Oh, alright.

19



55.     Your affiant believes that when **DOTSON** asked **HARVEY** "You went to the right one?" **DOTSON** was asking **HARVEY** if he was at **Target Location 3**. When **HARVEY** said "filling out the paperwork," **HARVEY** was referring to securing **Target Location 3** at Economy Storage of Waldorf.

56.     From officers who were conducting surveillance at **Target Location 3**, your affiant knows that at approximately 12:18 a.m., **HARVEY** arrived at **Target Location 3** operating **DOTSON**'s Ford truck and entered the Economy Storage office. At approximately 12:28 p.m., after the foregoing call ended, the officers observed **DOTSON** exit the Ford truck.

57.     As discussed previously, during Call 9955 between **DOTSON** and **MACKALL**, when **DOTSON** told **MACKALL**, "look, that's how you got to work it, how I work this shit, I be in storage one week, alright, or at least for real, storage my main like, start stashing my money, little bullshit there for real, over there I mean, however you look at it with the mixer, blender, you can have that literally right there in plain view, with nobody touching it because you only what it is, you feel me," your affiant believes that **DOTSON** was using coded language to describe to **MACKALL** that **DOTSON** conceals drug profits ("stashing my money") as well as drugs and drug paraphernalia ("little bullshit" and "mixer, blender") at the storage unit.

### Target Location 4

58.     **Target Location 4** is **GRAY**'s primary residence. **GRAY** is a lieutenant in the **DOTSON** organization. Based on records from the Maryland Motor Vehicle Administration ("MVA"), **GRAY** lists his address of record as an address on Imperial Court, Waldorf, Maryland.



Your affiant believes—based on intercepted calls, surveillance, and a Court-authorized GPS tracker affixed to **GRAY**'s white Ford—that **GRAY** resides at **Target Location 4**.[11]

59.     On July 3, 2019 beginning at approximately 12:15 p.m., **Target Telephone 1** exchanged the following text messages with 240-682-0322, a phone utilized by Individual 2:

| Time | Call Number | Direction | Text Message |
|------|-------------|-----------|--------------|
| 12:15 p.m. | 11501 | Incoming | You told me the other day you'll give me 5g for 400, right? |
| 12:24 p.m. | 11507 | Outgoing | Yes |
| 12:49 p.m. | 11534 | Incoming | Come over to deluxe inn, room 105. It's just me and my wife in my room. |
| 12:58 p.m. | 11536 | Outgoing | Ok |
| 1:09 p.m. | 11546 | Incoming | Okay, let me know you pulling up. Can you come in my room so we can talk and see what we can work with. I got cash, bro. |
| 1:18 p.m. | 11548 | Outgoing | On way |
| 1:22 p.m. | 11552 | Incoming | Okay. I'm trying to talk to you about business. You want us to talk in your car or you want to come inside my room and talk? |
| 1:28 p.m. | 11554 | Outgoing | Naw come to me pulling up 2min |

60.     Your affiant believes that when Individual 2 texted "You told me the other day you'll give me 5g for 400, right," Individual 2 was using coded language to ask **DOTSON** for a five-gram quantity of fentanyl for $400. **DOTSON**'s response "Yes" confirmed that **DOTSON** would provide the quantity for $400. When Individual 2 texted **DOTSON** "I'm trying to talk to you about business," your affiant believes—based on the quantity that Individual 2 requested— that Individual 2 was trying to establish himself as a drug distributor and was seeking to obtain more product from **DOTSON**. Based on those text messages, surveillance officers responded to the Deluxe Inn located in La Plata Maryland.

---

[11] **GRAY**'s vehicle is a white Ford truck with dark tinted windows bearing Maryland tag number 8DT9064. MVA records show that the truck is registered to **GRAY** ("**GRAY**'s truck").



61.     At approximately 1:35 p.m., surveillance officers observed **DOTSON** operating the Ford truck arrive in the parking lot of the Deluxe Inn. Officers observed Individual 2 exit Room 105 and enter into the front passenger seat of the Ford truck and meet with **DOTSON**. At approximately 1:38 p.m., Individual 2 exited the Ford truck and returned to Room 105, and **DOTSON** left the area.

62.     At 1:50 p.m., **DOTSON** used **Target Telephone 1** to send a text message to Individual 2 (Call 11563) that read "Here white truck." At 1:53 p.m., surveillance officers observed **GRAY**'s truck (which is white) arrive in the parking lot of the Deluxe Inn. Individual 2 then exited Room 105 and entered the passenger seat of **GRAY**'s truck, and after approximately one minute, exited **GRAY**'s truck and returned to Room 105.

63.     Your affiant believes that at approximately 1:35 p.m., **DOTSON** met with Individual 2 and provided Individual 2 with a five-gram quantity of fentanyl for $400. However, based on Individual 2's subsequent text message "I'm trying to talk to you about business," your affiant believes that Individual 2 wanted to purchase more than five grams of fentanyl/heroin, but that **DOTSON** did not have enough product at the time to supply Individual 2. Approximately 15 minutes later, **DOTSON** sent **GRAY** to the Deluxe Inn to supply Individual 2 with a larger quantity of fentanyl/heroin.

64.     At 2:16 p.m., Individual 2 texted **DOTSON** "Man, I appreciate the business!!! We're gonna do good. Keep eyes out. I'ma go get them papers then I'll hit you up" (Call 11576). Your affiant believes that Individual 2 was using vague language to express gratitude to **DOTSON** for sending **GRAY** to the Deluxe Inn to supply Individual 2 with an additional quantity of fentanyl/heroin. Your affiant further believes that **DOTSON** provided this quantity on



consignment to Individual 2 based on the phrase "I'ma go get them papers then I'll hit you up." Your affiant believes that Individual 2 was using coded language to tell **DOTSON** that he would sell the product and subsequently pay **DOTSON** for the supply.

65.    On July 9, 2018 at approximately 12:38 p.m., **Target Telephone 1** placed an outgoing call (Call 15029) to 240-860-3330, a phone utilized by **GRAY**. The following is a partial draft transcript of the conversation between **DOTSON** and **GRAY**.

> **GRAY**:    Yeah, I ain't trying to beat the block up, like if I go down the road, hit like two, three hundred.
>
> **DOTSON**:    But the thing is, you don't want any trash either, where the block ain't trying to beat you up. I know what you mean.
>
> **GRAY**:    Exactly, exactly.
>
> **DOTSON**:    When the last one in the phone and they like, uh, man, don't want to fuck with him but . . .
>
> **GRAY**:    Yeah, right, he got trash too, yep. I'm a, I'm a bag up most of them all in balls. I got like, I got like seventy grams of good. I'm a put it . . . put lot of it in balls cause I know he come every two, three days and . . . little bit for the people around, around the road.
>
> **DOTSON**:    That's how . . . that's how I just did it, I took twenty, I set the twenty, I meant, I put twenty-five, put twenty on it . . . Well, it was really twenty, and I put the rest of the shit on it which was like, sixteen.
>
> **GRAY**:    Oh!
>
> **DOTSON**:    That shit was already cut up.
>
> **GRAY**:    Yeah.

66.    Your affiant believes that when **GRAY** said "I ain't trying to beat the block up, like if I go down the road, hit like two, three hundred" and **DOTSON** replied "but the thing is, you don't want any trash either, where the block ain't trying to beat you up," **GRAY** and **DOTSON**



were using coded language to describe not selling an inferior product ("trash") to their drug customers ("the block").

67.     When **GRAY** said "I'm a bag up most of them all in balls. I got like, I got like seventy grams of good. I'm a put it . . . put lot of it in balls cause I know he come every two, three days and . . . little bit for the people around, around the road," **GRAY** was using coded language to tell **DOTSON** that **GRAY** had 70 grams of good product to distribute to his customers ("he come every two, three days" and "little bit for the people around the road") and was packaging the majority of the product into 3.5-gram quantities ("balls").[12] Through intercepted conversations between **DOTSON** and **GRAY**, your affiant knows that **GRAY** has his own customer base. Further, your affiant knows that **DOTSON** and **GRAY** are utilizing multiple sources of supply to obtain quantities of fentanyl/heroin.

68.     On July 14, 2019 at approximately 12:40 p.m., **Target Telephone 1** placed an outgoing call (Call 842) to **GRAY**. The following is a partial draft transcript of the conversation between **DOTSON** and **GRAY**.

| | |
|---|---|
| **DOTSON**: | What up babe, talk to me. |
| **GRAY**: | Man, a boy just called me saying he wanted fourteen. |
| **DOTSON**: | Of what? |
| **GRAY**: | (Unintelligible) down. |
| **DOTSON**: | What's up? |
| **GRAY**: | Yeah, Jamar, your boy Jamar just called me. |
| **DOTSON**: | What's up? I'm with it, what, what kind of deal do you want to do? |

---

[12] The term "eight ball" refers to a quantity of drugs that weights one eighth of an ounce.

24



| | |
|---|---|
| **GRAY**: | I don't know, I'll call him . . . ah . . . I, I'm a head up there. I'll call him, he's coming back. Back from . . . |
| **DOTSON**: | Yeah, but we're going to the track and shit. |
| **GRAY**: | Alright. |
| | . . . |
| **GRAY**: | Alright, I'm a see, what, what are we gonna charge him for fourteen? |
| **DOTSON**: | What you mean? Fourteen for fourteen! |
| **GRAY**: | Yeah, that's what I'm saying. |

69.    Your affiant believes that when **GRAY** said "a boy just called me saying he wanted fourteen," **DOTSON** replied "of what," and **GRAY** said "down," **GRAY** and **DOTSON** were using coded language to describe a drug customer wanting 14 grams of fentanyl/heroin ("down"). Further, when **DOTSON** asked "what kind of deal do you want to do," **GRAY** said "what are we gonna charge him for fourteen," and **DOTSON** replied "fourteen for fourteen," **GRAY** and **DOTSON** were using coded language to describe charging the individual ("Jamar") $1,400 for 14 grams of fentanyl/heroin.

70.    On July 31, 2019, **DOTSON** and **GRAY** travelled to the Detroit, Michigan area to pick up a motor for **DOTSON**'s race car. Your affiant conducted surveillance at **Target Location 1** and found **GRAY**'s truck parked on the street in front of **Target Location 1**.

71.    On August 1, 2019 at approximately 2:20 p.m., surveillance officers responded to **Target Location 1** and affixed a Court-authorized GPS tracker to **GRAY**'s truck. Since monitoring the GPS tracker, officers have learned that **GRAY**'s truck is consistently in the immediate vicinity of **Target Location 4** during the early morning hours.



72.    On August 4, 2019 at approximately 10:40 a.m., officers established surveillance at **Target Location 4**. Officers observed **GRAY**'s truck in a parking spot. At approximately 3:06 p.m., **Target Telephone 2** placed an outgoing call (Call 3649) to **GRAY**. During the conversation, **GRAY** said "well whenever it's time for us to go, we'll go, I'll shoot up." After the conversation, at approximately 3:22 p.m., officers observed **GRAY** exit the front door of **Target Location 4** and enter his truck. Officers maintained surveillance of **GRAY** as he travelled to **Target Location 2**. Your affiant believes that when **GRAY** told **DOTSON** "whenever it's time for us to go, we'll go, I'll shoot up," **GRAY** was referring to meeting a source of supply for fentanyl/heroin.

73.    On August 5, 2019 at approximately 9:33 a.m., **Target Telephone 2** sent the following photograph (Call 3734) to **GRAY**:



74.    **DOTSON** then used **Target Telephone 2** to send the following texts to **GRAY**:

| Time | Call Number | Direction | Text Message |
|------|-------------|-----------|--------------|
| 9:33 a.m. | 3735 | Outgoing | Look u don't owe that nigga shit I need to holla at slim with you |
| 9:36 a.m. | 3736 | Outgoing | Wake up nigga delete |



75.     Your affiant believes—based on the photograph and the text messages **DOTSON**

sent to **GRAY**—that **DOTSON** was telling **GRAY** that **DOTSON** did not agree with the amount

of money **GRAY** paid his source of supply for the suspected fentanyl/heroin depicted in the

photograph, and was instructing **GRAY** to delete the photograph from his cell phone once **GRAY**

viewed it.

76.     At approximately 9:37 a.m., **Target Telephone 2** received an incoming call (Call

3737) from **GRAY**. The following is a partial draft transcript of the conversation between

**DOTSON** and **GRAY**.

> **GRAY**:     What it is, he charging only on that mother fucking hundred-tip, right? I talked to him, he only can do sixty that way. So I said damn, looks like you charging me eighty-five, he said yeah. I'm getting up, getting my shit together.
>
> **DOTSON**:   Alright, call me in a bit.
>
> **GRAY**:     Alright, I'm gonna switch up trucks.
>
> **DOTSON**:   Alright, how long you think you be?
>
> **GRAY**:     Alright, ten minutes. I been up, took a shower, brushed my teeth and shit.
>
>             . . .
>
> **DOTSON**:   You delete that shit though?
>
> **GRAY**:     Yeah, yeah, deleted that. Yeah, I know what it was cause I went to holler at him, his thing is, he tried to keep the motherfucker at a hundred. I'm like, naw, I'm not the one to a hundred, no, hell no and he still tried to do that shit to me. I'm like, naw bro.

77.     Your affiant believes that when **GRAY** said "he charging only on that mother

fucking hundred-tip, right? I talked to him, he only can do sixty that way. So I said damn, looks



like you charging me eighty-five, he said yeah," **GRAY** was using coded language to tell **DOTSON** that **GRAY**'s source of supply charged him $85 per gram for the fentanyl/heroin, but wanted to charge **GRAY** $100 per gram.

78.    When **GRAY** said "I'm gonna switch up trucks," **GRAY** was referring to changing his vehicles between **GRAY**'s truck and the Tahoe. As stated previously, **GRAY** has been observed operating both vehicles. Your affiant knows—based on surveillance and the GPS tracker affixed to **GRAY**'s truck—that **GRAY** parks his truck at 5730 Nelson Point Road, Indian Head, Maryland, where he switches to the Tahoe. Officers have observed the Tahoe parked at **Target Location 4**. Your affiant believes that **GRAY** switches vehicles to thwart law enforcement efforts to identify his true residence (**Target Location 4**).

79.    Furthermore, when **DOTSON** asked **GRAY** "you delete that shit" and **GRAY** replied "yeah deleted that," **DOTSON** and **GRAY** were referring to the photograph of the suspected fentanyl/heroin on a scale that **DOTSON** sent **GRAY**. Additionally, when **GRAY** said "Yeah, I know what it was cause I went to holler at him, his thing is, he tried to keep the motherfucker at a hundred. I'm like, naw, I'm not the one to a hundred, no, hell no and he still tried to do that shit to me. I'm like, naw bro," **GRAY** was telling **DOTSON** that when he met with his source of supply ("holler at him") the source was trying to charge **GRAY** $100 per gram, but **GRAY** complained ("I'm not the one to a hundred").

### *Target Location 5*

80.    **Target Location 5** is the primary residence of **WOODLAND**—a drug runner for **DOTSON**. **WOODLAND**'s Maryland driver's license reflects **Target Location 5** as **WOODLAND**'s address of record. Further, on July 27, 2019, **WOODLAND** provided this



address to the CCSO as his address during an arrest of **WOODLAND**. Your affiant further knows

through intercepted calls, surveillance, and Maryland wage records that **WOODLAND** is

employed at the Advanced Auto store on Berry Road, Accokeek, Maryland.

81.     On June 20, 2019 at approximately 10:06 p.m., **Target Telephone 1** placed an

outgoing call (Call 4922) to 301-710-3832, a phone utilized by **WOODLAND**. The following is

a draft transcript of the call between **DOTSON** and **WOODLAND**.

> **DOTSON:**        Tell me what's left real fast.
>
> **WOODLAND:**    Shit, it's in the house, fuck.
>
> **DOTSON:**        That's what I just asked your simple ass. Man, fuck, man. I'm be at
>                          the track all day, man. I ain't going be able to do shit tomorrow.
>                          That's why I knew I should a . . . I could take the money out for real.
>                          Put towards that, and that way by Saturday, you can make another
>                          thousand for me. Then, I can make that up on Saturday.
>
> **WOODLAND:**    Two, four, five, six, seven, eight, nine, ten, eleven, twelve, fourteen
>                          . . . seventeen. Hey seventeen little ones right now.
>
> **DOTSON:**        Oh shit, bet, and how many bigs?
>
> **WOODLAND:**    Eleven bigs.
>
> **DOTSON:**        Oh bet. Say no more. We straight.

82.     Your affiant believes that when **DOTSON** asked **WOODLAND** "tell me what's

left real fast," **DOTSON** was asking **WOODLAND** how much fentanyl he had left to distribute.

When **WOODLAND** replied "it's in the house, fuck," **WOODLAND** was referring to **Target**

**Location 5**. Further, when **WOODLAND** referred to "seventeen little ones" and "eleven bigs,"

**WOODLAND** was using coded language to describe 17 half-gram quantities of fentanyl and 11



one-gram quantities of fentanyl. The conversation between **DOTSON** and **WOODLAND** continued as follows.

| | |
|---|---|
| **DOTSON:** | You ain't got no pistol? |
| **WOODLAND:** | Yeah, you know it. |
| **DOTSON:** | I was about to say I got a couple. |
| **WOODLAND:** | Yeah. I mean. I, I, I, loaning one right now. |
| **DOTSON:** | Loaning one? |
| **WOODLAND:** | Yeah. My man got one for sale. |
| **DOTSON:** | Nigga, I got em. |
| **WOODLAND:** | Yeah. |
| **DOTSON:** | I got four of them bitches. I got a .45, Smith & Wesson, I got a nine, I got another little thirty-eight. |
| **WOODLAND:** | Yeah do the right thing. |
| **DOTSON:** | Man, yeah bitch, you do the right thing. |

83.     Your affiant believes that **DOTSON** was telling **WOODLAND** that **DOTSON** had several firearms and would provide one to **WOODLAND**. Both **DOTSON** and **WOODLAND** have felony convictions and are prohibited from possessing firearms.

84.     Communications intercepted on **Target Telephone 1** and surveillance conducted in support of those interceptions have shown that **DOTSON** often provides **WOODLAND** with drugs to distribute to **DOTSON**'s customers.

85.     On June 21, 2019, **DOTSON** left the Maryland area to compete in an amateur car racing event. Before departing, **DOTSON** provided **Target Telephone 1** to **WOODLAND**, who



utilized **Target Telephone 1** to distribute **DOTSON**'s drugs on **DOTSON**'s behalf. Your affiant knows that it is common for more than one member of a drug trafficking organization to use a particular cell phone to make drug sales, particularly when the principle drug trafficker (e.g., **DOTSON**) is unavailable to do so. **DOTSON** gave **Target Telephone 1** to **WOODLAND** at **Target Location 5** on the morning of June 21, 2019 (as further detailed below).

86.     Beginning at approximately 9:45 a.m., **Target Telephone 1** exchanged the following text messages with 301-542-3544, a phone utilized by a drug customer of **DOTSON**'s referred to here as Individual 3:

| Time | Call Number | Direction | Text Message |
|------|-------------|-----------|--------------|
| 9:45 a.m. | 5131 | Outgoing | GM |
| 10:27 a.m. | 5170 | Incoming | Here |
| 10:32 a.m. | 5175 | Outgoing | Pull up hill |
| 10:33 a.m. | 5176 | Incoming | Omw |

87.     At approximately 10:32 a.m., officers conducting surveillance of **Target Location 5** observed **DOTSON** (operating the Silverado) turn onto Daffodil Place and continue to **Target Location 5**. At approximately 10:33 a.m., officers observed a white male operating a white Lincoln sedan with Maryland tag 2CH2455 ("the Lincoln sedan") drive towards **Target Location 5**. At approximately 10:42 a.m., the white male departed the area of **Target Location 5**. At approximately 10:44 a.m., officers observed **DOTSON** depart the area of **Target Location 5**.

88.     Your affiant believes that **DOTSON** met Individual 3 at **Target Location 5** and conducted a drug transaction. Your affiant knows based on MVA records that the Lincoln sedan is registered to Individual 4 (who shares Individual 3's last name) at Individual 3's address. Based on numerous interceptions occurring on **Target Telephone 1**, your affiant knows that when



**DOTSON** said "pull up hill," **DOTSON** was using coded language to describe **Target Location 5**, as **DOTSON** and **WOODLAND** both refer to **Target Location 5** as "the hill."

89.    Based on interceptions occurring over **Target Telephone 1**, your affiant also knows that **WOODLAND** maintained possession of **Target Telephone 1** from the morning of June 21 through the afternoon of June 24, 2019. For example, the following is a conversation between **WOODLAND** and **Individual 13**—one of **DOTSON**'s drug customers—that occurred on June 23, 2019 over **Target Telephone 1** while **DOTSON** was away. That day at approximately 9:50 a.m., **Target Telephone 1** received an incoming call (Call 5993) from 301-861-6777, a phone utilized by **Individual 13**. The following is a draft transcript of the call between **WOODLAND** and **Individual 13**:

| | |
|---|---|
| **Individual 13**: | Yo? |
| **WOODLAND**: | Joe not around yo, dude with the dreads though. |
| **Individual 13**: | Oh, for real? |
| **WOODLAND**: | Yeah. I been to your house before? |
| **Individual 13**: | Naw, you ain't been to my house, I mean, I met you at the car wash that one time, but uh, is this who I'm talking to right now? |
| **WOODLAND**: | Yeah, you be at that Car Wash on 925? |
| **Individual 13**: | Say what? |
| **WOODLAND**: | You was at the Car Wash on 925 or 228? |
| **Individual 13**: | Um, 228, naw, then, yeah, yeah, yeah, yeah, the one 228, the one next to that uh, the Dash Inn or whatever it is? |
| **WOODLAND**: | Yeah. |
| **Individual 13**: | Yeah, yeah, yeah, he usually always comes to me, I live in |



| | Suitland, I don't know if you know where that's at or not. |
|---|---|
| **WOODLAND**: | God damn, how much you got? |
| **Individual 13**: | 200, yeah he usually, I mean, he don't come down here for nothing less than 200, so I always make sure I have at least that, but uh, I'm a see if I can come to you, cause I knew when you said where you at I knew it had to be you, cause he don't never even ask me that, he always know where I'm at so I knew it had to be you, let me see if I can make it to you, give me a minute, I'll call you right back. |
| **WOODLAND**: | I was about to say if not meet me halfway or something. |
| **Individual 13**: | Yeah, yeah, yeah, yeah, what, you would meet me halfway? |
| **WOODLAND**: | Yeah I meet you halfway. |
| **Individual 13**: | Alright, let me see what's up real quick, I can do that, yeah, just give me like 45 minutes I can definitely do that. |

90. Your affiant believes that when **WOODLAND** said "Joe not around yo, dude with the dreads though," **WOODLAND** was using vague language to tell **Individual 13** that **DOTSON** was not around and that **WOODLAND** ("dude with the dreads") was using **Target Telephone 1**. Your affiant knows from surveillance that **WOODLAND**'s hair is styled with long and distinctive dreadlocks, and that **DOTSON**'s customers often refer to **WOODLAND** as "dreads."

91. On July 21, 2019 beginning at approximately 11:17 a.m., **Target Telephone 1** exchanged the following text messages with phone number 301-710-3832, a phone utilized by **WOODLAND**:

| Time | Call Number | Direction | Text Message |
|---|---|---|---|
| 11:17 a.m. | 4594 | Incoming | Take ya time bruh be with your family I rock it off meet u later with bread or whatever I'm off today I ain't doin shyt I got u |
| 11:23 a.m. | 4595 | Outgoing | Ok |
| 12:18 p.m. | 4629 | Outgoing | 4 people |



| 12:19 p.m. | 4630 | Incoming | Ok |
| 12:24 p.m. | 4634 | Outgoing | 100HillGo up hill 120 |
| 12:24 p.m. | 4636 | Outgoing | 40 |
| 12:29 p.m. | 4641 | Incoming | Got em |
| 12:45 p.m. | 4652 | Outgoing | 100 |
| 12:48 p.m. | 4659 | Incoming | When |
| 12:54 p.m. | 4660 | Outgoing | Marilyn |
| 12:54 p.m. | 4662 | Incoming | What she get big n small |
| 12:55 p.m. | 4664 | Outgoing | Yes |

92.     Your affiant believes that in this text message conversation, **DOTSON** was directing **WOODLAND** to sell fentanyl/heroin to **DOTSON**'s drug customers on **DOTSON**'s behalf. For example, when **WOODLAND** texted **DOTSON** "I rock it off meet u later with bread or whatever," **WOODLAND** was using coded language to tell **DOTSON** that **WOODLAND** would sell to customers and meet **DOTSON** later to give **DOTSON** the proceeds. When **DOTSON** texted **WOODLAND** "100" and "Marilyn," **DOTSON** was telling **WOODLAND** in coded language that a drug customer (who your affiant identified as Individual 5, whose first name is Marilyn) would purchase a $100 quantity of fentanyl/heroin. Your affiant believes that when **WOODLAND** texted "what she get big n small," **WOODLAND** was using coded language to confirm with **DOTSON** that Individual 5 ("Marilyn") would obtain 1.5 grams of fentanyl/heroin. From interceptions occurring over **Target Telephone 1** and **Target Telephone 2**, your affiant knows that **DOTSON** uses the terms "big" and "small" to refer to one-gram and half-gram quantities of fentanyl/heroin, respectively.

93.     On July 27, 2019 beginning at approximately 9:15 a.m., **Target Telephone 1** sent and received the following text messages with 301-710-3832, a phone utilized by **WOODLAND**.



| Time | Call Number | Direction | Text Message |
|------|-------------|-----------|--------------|
| 9:15 a.m. | 8144 | Outgoing | How I'm make money and you make money Yung wake up |
| 10:28 a.m. | 8213 | Outgoing | Shop go there asap |
| 10:28 a.m. | 8215 | Outgoing | Got 2 waiting |
| 10:30 a.m. | 8217 | Incoming | Bruh I be at shop 6 min |
| 10:32 a.m. | 8219 | Outgoing | Ok |
| 10:32 a.m. | 8220 | Outgoing | In green car in front of shop glove department |
| 10:32 a.m. | 8221 | Outgoing | Then mark house 100 |
| 10:33 a.m. | 8222 | Incoming | Bet |

94.     Your affiant believes that when **DOTSON** texted "How I'm make money and you make money Yung wake up," **DOTSON** was telling **WOODLAND** that he needed **WOODLAND** to sell drugs on his behalf. When **DOTSON** texted "shop go there asap . . . got 2 waiting," **DOTSON** was directing **WOODLAND** to go to **Target Location 2** and pick up drugs because **DOTSON** had two customers waiting. When **DOTSON** texted "in green car in front of shop glove department," **DOTSON** was telling **WOODLAND** where the drugs were located. Based on this text message conversation, your affiant mobilized surveillance officers.

95.     At approximately 10:40 a.m., officers observed **WOODLAND** arrive at **Target Location 2** operating a white Range Rover with Virginia tag USF4445 ("the Range Rover"). Officers observed **WOODLAND** park next to a green vehicle directly in front of **Target Location 2**. Officers then observed **WOODLAND** exit the Range Rover and enter **Target Location 2**. At approximately 10:47 a.m., officers observed **WOODLAND** exit **Target Location 2** and go into the green vehicle. Officers then observed **WOODLAND** go to the driver's side passenger door of the Range Rover and lean in, shut the door, and return to the driver's seat of the Range Rover. **WOODLAND** subsequently departed **Target Location 2**.



96.    At approximately 10:49 a.m., **Target Telephone 1** placed an outgoing call to
WOODLAND. The following is a draft transcript of the conversation between **DOTSON** and
WOODLAND.

| | |
|---|---|
| **WOODLAND**: | Fool? |
| **DOTSON**: | Yeah, you get it? |
| **WOODLAND**: | Yes sir, I'm on the way to Mark, my phone on one, I thought you had a charger at the house, I didn't put my . . . I'm at the shop. |
| **DOTSON**: | Alright, once you go to Mark go to Shell Gas Station, I got Lee and I got um . . . I got Matt there, both of them got a hundred, so all together it's gonna be three hundred. |
| **WOODLAND**: | Alright, so big and small for everybody? |
| **DOTSON**: | Matt, Matt, uh . . . go to Mark house, he got a hundred, then go to the Shell Gas Station across from Taco Bell uh . . . right there by the mall uh . . . that little uh . . . gas station across from Taco Bell. |
| **WOODLAND**: | Ah, ah, ah, everybody. |
| **DOTSON**: | And Lee is gonna be there, go inside and buy a charger. |
| **WOODLAND**: | Alright, hey? Um . . . big and small everybody? |
| **DOTSON**: | Huh? |
| **WOODLAND**: | Big and small for everybody right? |
| **DOTSON**: | Yeah, yeah. |
| **WOODLAND**: | Alright, Alright. |
| **DOTSON**: | And, and listen, it's a blue bag in there, that is in another bag, don't fuck with it, that's coke alright? Do you hear me? |
| **WOODLAND**: | Yeah, I hear you. I was just looking . . . . |
| **DOTSON**: | That's the coke, uh . . . I bagged the coke up this time, so |



everything runs smooth.

**WOODLAND**:        Alright.

**DOTSON**:        Alright.

97.    Your affiant believes that when **DOTSON** said "you get it" and **WOODLAND** replied "yes sir," **WOODLAND** was confirming to **DOTSON** that he picked up the drugs **DOTSON** left in the green vehicle. When **WOODLAND** said "big and small for everybody right," **WOODLAND** was confirming the drug orders of **DOTSON**'s customers. Additionally, when **DOTSON** said "I bagged the coke up this time, so everything runs smooth," **DOTSON** was telling **WOODLAND** that **DOTSON** provided **WOODLAND** with cocaine ("coke") to provide to customers.

98.    At approximately 10:52 a.m., a marked CCSO patrol unit got behind **WOODLAND**'s Range Rover and attempted to conduct a traffic stop. The Range Rover displayed illegal tint on the windows. Further, **WOODLAND**'s driving privileges were suspended in the State of Maryland. The officer activated his emergency equipment, but **WOODLAND** failed to stop and attempted to elude the officer. The officer pursued **WOODLAND** for approximately 3.6 miles before **WOODLAND** was stopped at 3296 Crain Highway, Waldorf, Maryland. **WOODLAND** was arrested and subsequently transported to the Charles County Detention Center.

99.    Officers did not locate drugs during a search of the Range Rover. Based on the call below, your affiant believes that **WOODLAND** threw the drugs from the vehicle and subsequently recovered the drugs after he was released from custody. During the booking process, **WOODLAND** provided his address as **Target Location 5** to the CCSO.



100.    At approximately 8:42 p.m., **Target Telephone 2** placed an outgoing call to 301-710-3832, a phone utilized by **WOODLAND**. The following is a draft transcript of the conversation between **DOTSON** and **WOODLAND**.

| | |
|---|---|
| **WOODLAND**: | Yo. |
| **DOTSON**: | How the hell you get out? |
| **WOODLAND**: | Oh, bond. |
| **DOTSON**: | How much? |
| **WOODLAND**: | Hundred-fifty. |
| **DOTSON**: | Come on, yo. |
| **WOODLAND**: | Yeah. She said if she has it, she was gonna let me out on PI, but she was like, if I had a reckless, I had a reckless driving, she had to put something on it. |
| **DOTSON**: | So, so, so, hold on . . . |
| **WOODLAND**: | Can you hear me? |
| **DOTSON**: | Yeah, what you do with that? |
| **WOODLAND**: | So, so, look right . . . when I left the shop, right? |
| **DOTSON**: | I'm a call you on FaceTime. |
| **WOODLAND**: | I got . . . |
| **DOTSON**: | Five minutes. |
| **WOODLAND**: | Alright, alright, alright, bet. |

101.    Your affiant believes that when **DOTSON** asked **WOODLAND** "what you do with that?" and **WOODLAND** began to reply "when I left the shop," **DOTSON** was referring to the drugs that **WOODLAND** picked up from the green vehicle, and **WOODLAND** was about to



explain to **DOTSON** what he did with the drugs during the chase. Further, when **DOTSON** said "I'm a call you on FaceTime," **DOTSON** decided to use a more secure method of communicating with **WOODLAND** to find out what happened to the drugs.

### *Target Location 6*

102.    **Target Location 6** is **Individual 12**'s primary residence. As stated previously, **Individual 12** is a cocaine source of supply for **DOTSON**. Based on MVA records, your affiant knows that **Individual 12** lists his address of record as an address on Tyburn Oaks Court, Waldorf, Maryland. Further, based on surveillance and intercepted calls, your affiant knows that **Individual 12** resides at **Target Location 6** with his paramour, Individual 6, and a small child.

103.    On July 13, 2019 at approximately 1:30 p.m., **Target Telephone 2** placed an outgoing call (Call 102) to 301-399-2350, a phone utilized by **Individual 12**. The following is a draft transcript of the conversation between **DOTSON** and **Individual 12**.

| | |
|---|---|
| **Individual 12**: | Hello? |
| **DOTSON**: | Hey? |
| **Individual 12**: | Yeah? |
| **DOTSON**: | The girl hit, said, how you doing your, uh, your coke? |
| **Individual 12**: | What you mean? |
| **DOTSON**: | I told her forty a dot. |
| **Individual 12**: | I mean, it really, I will, I mean, I'll bust it down. It really don't matter, I usually do, you know what I'm saying, forty or better, but I'll bust the bitch down, whatever. |
| **DOTSON**: | It's up to you, alright, hold on. |
| **Individual 12**: | Yeah. |

39



. . .

**Individual 12:**    Well shit, I'm getting ready to jump in the shower, just call me when you ready to go to the shop or something, I'll meet you over there.

**DOTSON:**    I'll be over there.

**Individual 12:**    Alright.

104.    Your affiant believes that when **DOTSON** said "how you doing your, uh, your coke," **DOTSON** was asking **Individual 12** how much **Individual 12** was charging for cocaine. When **Individual 12** replied "I'm saying, forty or better, but I'll bust the bitch down," **Individual 12** was telling **DOTSON** that he charges $40 per half-gram quantity of cocaine. Based on this conversation, surveillance officers were alerted to the pending meeting between **DOTSON** and **Individual 12**.

105.    At approximately 4:30 p.m., officers observed **DOTSON**'s Ford truck parked at a tattoo shop located on Old Washington Road, Waldorf, Maryland. At approximately 5:06 p.m., officers observed a tan Chevrolet Tahoe SUV with Virginia tag VXR7815 ("the Tahoe SUV") pull into the parking lot of the tattoo shop. Officers observed **Individual 12** exit the Tahoe SUV and enter the tattoo shop.

106.    At approximately 5:41 p.m., officers observed **DOTSON** and **Individual 12** exit the tattoo shop and get into their respective vehicles. Officers observed both **DOTSON** and **Individual 12** drive across the street to the 925 Liquor Store at 2795 Old Washington Road, where **Individual 12** exited the Tahoe SUV and entered the passenger seat of **DOTSON**'s Ford truck. At approximately 5:45 p.m., **DOTSON** drove out of the parking lot with **Individual 12**. Officers



maintained surveillance of **DOTSON** and **Individual 12** as the two travelled north on Old Washington Road, but subsequently lost sight of **DOTSON**'s Ford truck due to traffic conditions.

107.    Based on the intercepted conversation and surveillance of **DOTSON** and **Individual 12**, your affiant believes that **DOTSON** and **Individual 12** met to conduct a cocaine transaction. Further, your affiant knows based on Virginia Motor Vehicle records that the tag affixed to the Tahoe SUV (that **Individual 12** operated) is registered to Individual 6 at **Target Location 6**.

108.    On June 15, 2019 at approximately 4:33 p.m., **Target Telephone 2** placed an outgoing call (Call 452) to 301-399-2350, a phone utilized by **Individual 12**. The following is a draft transcript of the conversation between **DOTSON** and **Individual 12**.

| | |
|---|---|
| **Individual 12**: | Hello? |
| **DOTSON**: | What the fuck you doing? |
| **Individual 12**: | Shit, in the crib about to leave out. |
| **DOTSON**: | When you get a second, when your man come back around, uh, I'm trying, when you go back and re-up, I'm trying to go with you. |
| **Individual 12**: | Alright, that's a bet. He, uh, shit, I just fuck around, I just finish hollering at this nigga, I'm a grab something from him in the morning. |
| **DOTSON**: | Yeah, I ain't in a rush, I'll go with you, I'm a go probably grab me a seven. |
| **Individual 12**: | Alright, that's a bet, got you, you can just go in with me, I'm a just grab a zone. |
| **DOTSON**: | Alright bet, say no more, I'm about to be at the shop now. |



109.    Your affiant believes that when **DOTSON** said "when you go back and re-up, I'm trying to go with you," **DOTSON** was telling **Individual 12** in coded language that when **Individual 12** was going to meet with **Individual 12**'s source of supply to obtain drugs ("re-up"), **DOTSON** wanted to go with **Individual 12**. When **DOTSON** said "I'm a go probably grab me a seven" and **Individual 12** replied "you can just go in with me, I'm a just grab a zone," **DOTSON** and **Individual 12** were using coded language to describe obtaining a seven-gram quantity of cocaine ("seven") and an ounce of cocaine ("a zone").

110.    On July 16, 2019 at approximately 10:34 a.m., **Target Telephone 2** placed an outgoing call (Call 585) to 301-399-2350, a phone utilized by **Individual 12**. The following is a draft transcript of the call between **DOTSON** and **Individual 12**.

| **Individual 12**: | Hello? |
|---|---|
| **DOTSON**: | Yeah fool-fool. |
| **Individual 12**: | What's good? |
| **DOTSON**: | Yeah when you going to see your folks? |
| **Individual 12**: | Shit probably in a little bit. |
| **DOTSON**: | Alright, let me know, I'll go with you. |
| **Individual 12**: | Alright, alright. |

111.    Your affiant believes that when **DOTSON** asked **Individual 12** "when you going to see your folks," **DOTSON** was using vague language to ask **Individual 12** when he was going to meet with his source of supply. Based on this call, surveillance officers were alerted to the pending meeting between **DOTSON** and **Individual 12**.



112.    At approximately 1:38 p.m., officers observed **Individual 12** exit **Target Location 6** and walk to his Tahoe SUV. Officers observed **Individual 12** open the passenger door to the Tahoe SUV. **Individual 12** then shut the door to the Tahoe SUV and got into the driver's seat of a blue Ford Escape ("the Ford Escape") with Maryland tag 4DX7221, which is also registered to Individual 6. **Individual 12** then drove out of the parking lot of **Target Location 6**.

113.    Officers maintained surveillance of **Individual 12** as he traveled to the Nick's of Clinton grocery store located on St. Charles Parkway, Waldorf, Maryland. Officers observed **Individual 12** pull into the parking lot and park next to a white Ford sedan with Maryland tag 6CH4208. At approximately 1:41 p.m., officers observed a black male exit the white Ford sedan and get into the passenger seat of **Individual 12**'s Ford Escape. A short time later, the black male exited **Individual 12**'s Tahoe SUV and got back into the white Ford sedan. Both **Individual 12** and the black male then departed the parking lot in their respective vehicles.

114.    At approximately 2:01 p.m., officers observed **Individual 12** arrive at a residence located on Proctor Place in Waldorf, Maryland. Officers observed **Individual 12** standing on the front porch of this residence. At approximately 2:26 p.m., **Individual 12** left the residence and traveled to **DOTSON**'s business—**Target Location 2**.

115.    Based on the conversation between **DOTSON** and **Individual 12**, and the surveillance of **Individual 12**, your affiant believes that **Individual 12** delivered a quantity of cocaine to **DOTSON** at **Target Location 2**.

116.    On July 18, 2019 at approximately 10:46 a.m., **Target Telephone 2** placed an outgoing call (Call 801) to 301-399-2350, a phone utilized by **Individual 12**. The following is a draft transcript of the call between **DOTSON** and **Individual 12**.

43



| | |
|---|---|
| **Individual 12**: | Hello? |
| **DOTSON**: | Hey call your man, I need some nine-millimeter bullets son. |
| **Individual 12**: | Huh? |
| **DOTSON**: | I need some nine bullets ASAP dog. |
| **Individual 12**: | Uh, alright, bet, let me see if he around. |
| **DOTSON**: | Shit, fuck, I ain't going to lie, or see if somebody got a nice ass Glock that they trying to get rid of, like a Glock seventeen or something. |
| **Individual 12**: | Alright. |
| **DOTSON**: | But I ain't trying to pay an arm and a leg either. |
| **Individual 12**: | Alright. |
| **DOTSON**: | Alright. |

117.    Your affiant believes that in this call, **DOTSON** was asking **Individual 12** for 9mm ammunition and a Glock Model 17 9mm pistol.

118.    On July 26, 2019 at approximately 5:28 p.m., **Target Telephone 2** received an incoming call (Call 2072) from 301-399-2350, a phone utilized by **Individual 12**. The following is a draft transcript of the conversation between **DOTSON** and **Individual 12**.

| | |
|---|---|
| **DOTSON**: | She said she did it both ways, trash, right? And she said it the other day, she was like, I was wondering if it was the same shit the other day but I knew I had to try it, come to get it one more time, I was like. |
| **Individual 12**: | She ain't like it? |
| **DOTSON**: | Naw, that, I didn't get that from you though, you know what I'm saying? |
| **Individual 12**: | Yeah. |



**DOTSON:**   You feel what I'm saying? And I asked her that, did she fuck with, she was like, oh, way better than that.

**Individual 12:**   I hear you

**DOTSON:**   When you first gave it to me I ain't really hit it for real, you know what I'm saying?

**Individual 12:**   Yeah I ain't put nothing on it, that's how I gave it to you just how I had it.

**DOTSON:**   I know what it need, but I know, how you, you know what I'm saying, what you supposed to, you get what I'm getting at?

**Individual 12:**   Yeah, to make a few dollars.

**DOTSON:**   Yeah, but, that's what I'm saying, so she said that shit was still good, that's why she hit back with me cause she was like oh shit is bomb-bomb, cause I ain't put, put like a one and anything, I could have probably put a whole three-five on that bitch for real.

**Individual 12:**   Yeah, I already know, that shit that's what I be talking about.

119.   Your affiant believes that when **DOTSON** said "She said she did it both ways, trash, right," **DOTSON** was using coded language to tell **Individual 12** that a drug customer of **DOTSON**'s ("she") used cocaine and crack cocaine ("did it both ways"), and that the product was poor quality ("trash"). When **DOTSON** said "I didn't get that from you though, you know what I'm saying," **DOTSON** was reassuring **Individual 12** that the poor quality cocaine was not the cocaine that **Individual 12** provided to **DOTSON**. Additionally, when **DOTSON** said "when you first gave it to me I ain't really hit it for real" and **Individual 12** replied "yeah I ain't put nothing on it, that's how I gave it to you just how I had it," **DOTSON** and **Individual 12** were using coded language to describe the uncut cocaine that **Individual 12** provided to **DOTSON**.



120.    On August 2, 2019 at approximately 11:56 a.m., **Target Telephone 2** placed and outgoing call (Call 3245) to 301-399-2350, a phone utilized by **Individual 12**. Provided below is a draft transcript of the conversation between **DOTSON** and **Individual 12**.

| | |
|---|---|
| **Individual 12**: | Hello? |
| **DOTSON**: | Don't come down Post Office Road, them bitches out there. |
| **Individual 12**: | Huh? |
| **DOTSON**: | Don't come out there by that 7-11, them bitches out there, about six of them. |
| **Individual 12**: | Alright bet. |
| **DOTSON**: | Alright. |
| **Individual 12**: | Alright. |

121.    Your affiant believes that when **DOTSON** told **Individual 12** "don't come out there by that 7-11, them bitches out there, about 6 of them," **DOTSON** was alerting **Individual 12** to the presence of marked Charles County and Maryland State Police patrol units that were in the area of the 7-Eleven and Post Office Road at the time of the call.

122.    On August 8, 2019 at approximately 7:55 a.m., officers conducting surveillance at **Target Location 6** observed **Individual 12**'s Tahoe SUV and the Ford Escape parked in the parking lot of **Target Location 6**. At approximately 2:05 p.m., a uniformed CCSO officer investigating a noise complaint knocked on the front door of **Target Location 6**. **Individual 12** answered the door and spoke to the officer. Surveillance officers debriefed the CCSO officer, who said that **Individual 12** and a small child were present at **Target Location 6**.



***Target Location 7***

123.   **Target Location 7** is **Individual 13**'s primary residence. Your affiant knows based on Maryland Court records that **Individual 13** lists **Target Location 7** as his address of record. Based on surveillance and Maryland Real Property Records, your affiant also knows that **Target Location 7** is owned by Individual 7, who is **Individual 13**'s grandmother.

124.   On May 8, 2019, your affiant debriefed a source of information identified as Individual 8.[13] Individual 8 provided the following information concerning **Individual 13** and Victim 1, who died on January 7, 2018 from fentanyl intoxication (as the Office of the Chief Medical Examiner for the State of Maryland determined).

125.   Individual 8 said that he knew Victim 1 since childhood and maintained contact with Victim 1 up until his death. Individual 8 stated that Victim 1 struggled with drug addiction for a "long time." Individual 8 said Victim 1 was dating **Individual 13** and that Victim 1 had confided in Individual 8, telling Individual 8 that **Individual 13** was selling heroin and could get Victim 1 "anything they wanted." Individual 8 told your affiant that Victim 1 conveyed to Individual 8 that **Individual 13** was residing with his "grandmother."

126.   During the weekend of January 6, 2018, Individual 8 was with Victim 1 and **Individual 13** in Frostburg, Maryland. Victim 1 told Individual 8 that Victim 1 was "using" again, and that **Individual 13** was also using and supplying Victim 1 with heroin. Individual 8 said that Victim 1 told him that Victim 1 overdosed earlier in the week at **Individual 13**'s home, and that

---

[13] Individual 8 is not an established source for the DEA or CCSO, and as such is not working for compensation or to work off charges. Your affiant has not discovered any criminal history for Individual 8. Your affiant corroborated Individual 8's information to the extent possible through phone analysis and other witness interviews.



medical personnel responded and revived Victim 1. Individual 8 said that **Individual 13** also confirmed this event, stating to Individual 8 that it "scared the shit out of him."

127.    Individual 8 stated that he departed from Frostburg on January 7, 2018, and that Victim 1 and **Individual 13** offered to drive Individual 8 to Washington, DC, from where Individual 8 was traveling to New York. Individual 8 declined the offer and stated that he spoke to Victim 1 later that afternoon when Victim 1 arrived at **Individual 13**'s home.

128.    On January 7, 2018 at approximately 8:42 p.m., **Individual 13** called the Prince George's County Emergency Communications ("911") Center and reported that Victim 1 was unresponsive at his residence. PGPD and Prince George's County Fire Department personnel responded to **Target Location 7** and found Victim 1 suffering from an apparent overdose. Medical personnel pronounced Victim 1 deceased at approximately 9:16 p.m.

129.    PGPD Homicide detectives interviewed **Individual 13**, who provided the following information to detectives. **Individual 13** said he and Victim 1 arrived home from Frostburg, Maryland at approximately 3:00 p.m. **Individual 13** stated that Victim 1 inhaled a white powdery substance—believed to be heroin—and that both **Individual 13** and Victim 1 went to **Individual 13**'s bedroom where both subsequently fell asleep. **Individual 13** said he awoke at approximately 8:40 p.m. and found Victim 1 unresponsive. **Individual 13** also related to PGPD detectives that Victim 1 was hospitalized on December 28, 2017 after ingesting suspected heroin. **Individual 13** provided PGPD detectives with his cell phone number (301-861-6777).

130.    Your affiant reviewed the forensic examination of Victim 1's cellular phone (identified as cellular number 240-549-3708) which PGPD detectives recovered. Your affiant



found, among other communications, the following text message thread between **Individual 13**'s

cellular phone and Victim 1.

131.    On January 4, 2018 at approximately 1:48 p.m., **Individual 13** sent Victim 1 a text

message that read "Just left my p.o. going to meet my boy now lol." At approximately 1:49 p.m.,

Victim 1 replied to **Individual 13** with a text message that read "Ok cool." At approximately 2:35

p.m., **Individual 13** sent Victim 1 the following photograph via multimedia messaging service.



132.    At approximately 2:35 p.m., Victim 1 replied to **Individual 13**'s MMS photograph

with a text message that read "Duh don't send that over the phone smh." At approximately 2:36

p.m., **Individual 13** replied to Victim 1 with a text message that read "O my god just erase it stop

you panicking lol."

133.    Your affiant believes that in this message thread, **Individual 13** told Victim 1 that

**Individual 13** was going to meet his source of supply for heroin ("going to meet my boy now").

Further, the above photograph **Individual 13** sent to Victim 1 depicts three small zip-lock bags

containing a white powdery substance consistent with the appearance of heroin. Your affiant



believes that this is the heroin **Individual 13** obtained from his source of supply (which as described throughout this affidavit is **DOTSON**).

134.    On Friday April 5, 2019, at approximately 8:45 a.m., **DOTSON** posted a video on his Facebook account. The posting is titled "TURN UP FRIDAY, I WANT THE MONEY, YA WANT THE (FAME)." The video shows **DOTSON** driving his vehicle, singing along with various songs and commenting on various subjects. The video clearly shows **DOTSON** traveling to Homer Avenue in Suitland, Maryland as **DOTSON** comments, "Y'all don't know nothing about Homer Avenue." The video shows **DOTSON** as he pulls up near **Individual 13**'s home (**Target Location 7**) and gets out of the vehicle. The video ends with **DOTSON** knocking on the front door of a residence and yelling, "DK, DK." Your affiant believes that this video depicts **DOTSON** traveling to meet with **Individual 13**, whose moniker is "DK" (the initials for **Individual 13**).

135.    On June 29, 2019 beginning at approximately 9:13 a.m., **Target Telephone 1** exchanged the following text messages with 301-861-6777, a phone utilized by **Individual 13**:

| Time | Call Number | Direction | Text Message |
|------|-------------|-----------|--------------|
| 9:13 a.m. | 8799 | Incoming | Im cool. I got 125 but no car |
| 9:13 a.m. | 8801 | Outgoing | I got u bruh |
| 9:13 a.m. | 8804 | Incoming | Ok cool bro. Good lookin |

136.    Your affiant believes that based on the text message **Individual 13** sent stating "I got 125 but no car," **Individual 13** was using coded language to request a $125 quantity of fentanyl/heroin from **DOTSON**. Your affiant believes that **DOTSON**'s response "I got u bruh" confirmed that **DOTSON** would deliver the requested amount to **Individual 13**. Based on those text message, surveillance officers responded to **Individual 13**'s residence, located at **Target Location 7**.



137.   At approximately 10:47 a.m., **Target Telephone 1** sent the following text messages to **Individual 13**:

| Time | Call Number | Direction | Text Message |
|------|-------------|-----------|--------------|
| 10:47 a.m. | 8926 | Outgoing | On way |
| 11:37 a.m. | 8958 | Outgoing | Here |

138.   At approximately 11:38 a.m., surveillance officers observed **DOTSON** operating the Ford truck arrive in front of **Target Location 7**. Officers observed **Individual 13** exit the front door of the residence and get into the passenger side of **DOTSON**'s truck for approximately one minute. **Individual 13** then got out of his truck and returned to his residence, and **DOTSON** departed the area. Based on the intercepted communications and surveillance, your affiant believes that **DOTSON** delivered **Individual 13** a $150 quantity of fentanyl/heroin.

139.   On July 3, 2019 beginning at approximately 6:53 p.m., **Target Telephone 1** exchanged the following text messages with 301-861-6777, a phone utilized by **Individual 13**:

| Time | Call Number | Direction | Text Message |
|------|-------------|-----------|--------------|
| 6:53 p.m. | 11790 | Incoming | Yooo u trying to come thru tonight I got 200 |
| 7:11 p.m. | 11804 | Incoming | What time you thinking?? |
| 7:18 p.m. | 11810 | Outgoing | Like 10 |
| 7:19 p.m. | 11811 | Incoming | Ok ima be ready for you |
| 10:15 p.m. | 11851 | Incoming | Where would I need to meet u? |
| 10:16 p.m. | 11852 | Outgoing | Hospital |
| 10:16 p.m. | 11854 | Incoming | I'll be at the hospital in 20 |
| 10:29 p.m. | 11858 | Outgoing | Ok |

140.   Your affiant believes that when **Individual 13** texted "u trying to come thru tonight I got 200," **Individual 13** was using coded language to request a $200 quantity of fentanyl/heroin from **DOTSON**. When **DOTSON** texted "Hospital," **DOTSON** was identifying Southern Maryland Hospital as the meeting place to conduct the drug transaction with **Individual 13**. Based



on those text messages, surveillance officers were alerted to the pending meeting between **DOTSON** and **Individual 13**.

141.    At approximately 10:00 p.m., officers established surveillance at **Target Location 7**. At approximately 10:23 p.m., officers observed a gold Honda Minivan with Maryland tag 04571M0 ("the Honda Van") back out of the driveway of **Target Location 7**. Your affiant knows based on MVA records that the Honda Van is registered to Individual 7 at **Target Location 7**.

142.    Officers maintained surveillance of the Honda Van as it travelled to the parking lot of the Colony South Hotel, which is located in front of Southern Maryland Hospital in Clinton, Maryland. Officers observed the Honda Van park in the parking lot and a white male matching **Individual 13**'s description sitting in the driver's seat of the Honda Van.

143.    At approximately 11:01 p.m., officers observed **DOTSON** arrive in the parking lot of the Colony South Hotel operating the Ford truck. Officers observed **Individual 13** exit the Honda Van and walk over to **DOTSON**'s Ford truck. Less than a minute later, **Individual 13** returned to the Honda Van, and both **DOTSON** and **Individual 13** departed the area in their respective vehicles. Your affiant believes that **DOTSON** supplied **Individual 13** with a $200 quantity of fentanyl/heroin.

144.    On July 25, 2019 beginning at approximately 8:47 a.m., **Target Telephone 1** exchanged the following text messages with 301-861-6777, a phone utilized by **Individual 13**:

| Time | Call Number | Direction | Text Message |
|------|-------------|-----------|--------------|
| 8:47 a.m. | 6769 | Incoming | Im cool im tryin to see u for a fam lol |
| 9:16 a.m. | 6784 | Incoming | Colony South |

145.    Your affiant believes that when **Individual 13** texted **DOTSON** "tryin to see u for a fam," **Individual 13** was using coded language to request a 3.5-gram quantity of fentanyl/heroin.



Your affiant knows from debriefings of CS2 that **DOTSON** uses the code "family pack" ("fam") to describe an approximate 3.5-gram quantity of fentanyl/heroin. When **DOTSON** replied "Colony South," **DOTSON** told **Individual 13** to meet at the Colony South Hotel to conduct the transaction. Surveillance officers were alerted to the pending meeting between **DOTSON** and **Individual 13**.

146.    Although officers could not respond in time to observe the meeting between **DOTSON** and **Individual 13**, at approximately 9:52 a.m. an officer observed the Honda Van parked in the parking lot of Southern Maryland Hospital. The officer observed **Individual 13** sitting in the driver's seat.

147.    At approximately 9:52 a.m., **Target Telephone 1** received an incoming call (Call 6819) from 301-861-6777, a phone utilized by **Individual 13**. The following draft transcript of the conversation between **DOTSON** and **Individual 13**.

| | |
|---|---|
| **DOTSON**: | Yes sir? |
| **Individual 13**: | Uh which way you go, I'm trying to grab another one of them things right now. |
| **DOTSON**: | What, uh, meet me at Brandywine Target. |
| **Individual 13**: | Alright. |
| **DOTSON**: | Trying to tell you. |
| **Individual 13**: | I know, I know, I just pulled over at the Hospital so I'm leaving right from here right now. |
| **DOTSON**: | Alright bet. |
| **Individual 13**: | Alright. |



148.     Your affiant believes that when **Individual 13** said "I'm trying to grab another one of them things right now," **Individual 13** was using vague language to request another quantity of fentanyl/heroin. When **DOTSON** said "meet me at Brandywine Target," **DOTSON** was instructing **Individual 13** where to meet to conduct the transaction. At approximately 10:06 a.m., **Target Telephone 1** sent a text message to **Individual 13** at 301-861-6777 (Call 6826) that stated "McDonald's bewine." Surveillance officers were notified of the pending meeting between **DOTSON** and **Individual 13**.

149.     At approximately 10:11 a.m., officers followed **Individual 13**—who was operating the Honda Van—to the McDonald's restaurant located on Crain Highway, Brandywine, Maryland, where **DOTSON** was sitting in the parking lot in his Ford truck. **Individual 13** parked the Honda Van, exited, and walked to **DOTSON**'s Ford truck. **Individual 13** then went to the passenger side of **DOTSON**'s Ford truck before returning to the Honda Van. Both **DOTSON** and **Individual 13** departed the McDonald's parking lot in their respective vehicles. Your affiant believes that **DOTSON** met with **Individual 13** to supply **Individual 13** with fentanyl/heroin.

### *Target Location 8*

150.     **Target Location 8** is **HARVEY**'s primary residence. As stated previously, CS1 identified **HARVEY** as one of **DOTSON**'s drug runners. Your affiant knows based on MVA records that **HARVEY** lists his address of record as an address on Holly Street, Indian Head, Maryland. Moreover, the vehicle that **HARVEY** routinely uses to distribute drugs on **DOTSON**'s behalf—a white Ford Crown Victoria with Maryland tag 5CV6135 ("the Crown Victoria")—is listed to Individual 9 (**HARVEY**'s paramour, who shares **HARVEY**'s last name) at the same address.



151.    On July 18, 2019, officers served a subpoena on the Glennel Apartments, located on Cherry Street in King George, Virginia. The resident agent for Glennel Apartments informed those officers that **HARVEY** and Individual 9 were the only tenants residing in **Target Location 8**. Further, on April 13, 2019, the King George County Sheriff's Office arrested **HARVEY** for driving while intoxicated. During the booking process, **HARVEY** provided his cellular number as 240-377-6157—the same number intercepted on **Target Telephone 1** and **Target Telephone 2**. Based on the following evidence, your affiant believes that **HARVEY** resides at **Target Location 8**.

152.    In May 2018, CS1 told officers that **DOTSON** uses runners to sell on **DOTSON**'s behalf, and identified **HARVEY** as a member of the **DOTSON** organization.

153.    On May 5, 2018, **DOTSON** was arrested for assault and destruction of property in St. Mary's County. **DOTSON** subsequently pled guilty to second degree assault and was sentenced to four years' imprisonment with three years and three months suspended. On June 28, 2018, **DOTSON** was committed to the St. Mary's County Detention Center to serve his sentence.[14]

154.    On August 15, 2018, CCSO detectives met with CS1 for the purpose of conducting a controlled purchase of heroin. CS1 made a recorded phone call to 301-399-4454 and arranged to purchase a $100 quantity of heroin. During the call, CS1 was instructed to meet at the CVS Pharmacy parking lot located on Leonardtown Road, Waldorf, Maryland. CS1 travelled to the CVS Pharmacy where CS1 met with **HARVEY** in the parking lot and conducted the transaction

---

[14] **DOTSON** has made specific references to acts of violence he has committed. For example, on April 9, 2019, during a controlled purchase, DOTSON told CS2 (who was wearing a recording device) "Go look me up. **ANTHONY DOTSON**. You have my real name. Dog, I got murders and all that on my record."



with **HARVEY**, exchanging $100 in law enforcement funds for a quantity of heroin. **HARVEY** was operating the Crown Victoria during the transaction.

155.    After the transaction, CS1 provided the detectives with the suspected heroin that CS1 purchased from **HARVEY**. The suspected heroin and packaging were consistent with fentanyl/heroin. The suspected heroin was not subjected to a "field test."

156.    On June 12, 2019 at approximately 8:35 p.m., **Target Telephone 1** placed a call (Call 700) to 240-377-6157, a phone utilized by **HARVEY**. The following is a draft transcript of the call between **DOTSON** and **HARVEY**.

| | |
|---|---|
| **HARVEY:** | Hello? |
| **DOTSON:** | You leave yet? |
| **HARVEY:** | No. |
| **DOTSON:** | Alright. |
| **HARVEY:** | Alright. |
| **DOTSON:** | I should've just went down there and meet him, yo. |
| **HARVEY:** | I can head down there. |
| **DOTSON:** | He at the Deluxe Inn. It's $200, it ain't like it's 50, you feel me? |
| **HARVEY:** | Right. Alright, I'll shoot down there real quick. I'm on my way there. |
| **DOTSON:** | Bet. |

157.    Your affiant believes that in this conversation, **DOTSON** directed **HARVEY** to distribute the $200 quantity of fentanyl to Individual 2 at the Deluxe Inn. Based on this call, surveillance officers were alerted to the pending meeting between **HARVEY** and Individual 2.



158.    At approximately 8:45 p.m., officers established surveillance at the Deluxe Inn in La Plata, Maryland. Officers observed a white male—later identified as Individual 2—standing outside the hotel smoking a cigarette. At approximately 9:08 p.m., officers observed **HARVEY** operating the Crown Victoria arrive in the parking lot. Individual 2 got into the passenger side of **HARVEY**'s vehicle. **HARVEY** then drove through the parking lot with Individual 2, and Individual 2 exited the vehicle a few moments later and returned to the hotel. Your affiant believes that **HARVEY** met with Individual 2 for the purpose of distributing the $200 quantity of fentanyl to Individual 2.

159.    On June 19, 2019 beginning at approximately 4:10 p.m., **Target Telephone 1** exchanged the following text messages with 301-848-3965, a number utilized by a drug customer of **DOTSON**'s identified here as Individual 10:

| Time | Call Number | Direction | Text Message |
| --- | --- | --- | --- |
| 4:10 p.m. | 4397 | Incoming | You around |
| 4:53 p.m. | 4411 | Outgoing | Go to the McDonald's on route 5 |
| 4:54 p.m. | 4414 | Incoming | K |
| 5:09 p.m. | 4420 | Incoming | Here |
| 5:19 p.m. | 4424 | Outgoing | How much |
| 5:19 p.m. | 4426 | Incoming | Small |

160.    Your affiant believes that when **DOTSON** texted Individual 10 "how much" and Individual 10 replied "small," Individual 10 was using coded language to request a half-gram quantity of fentanyl. After intercepting this conversation, surveillance units were alerted to the pending drug transaction.

161.    At approximately 5:05 p.m., surveillance officers observed Individual 10 arrive at the McDonald's restaurant located on Leonardtown Road, Waldorf, Maryland, operating a white Volkswagen sports utility vehicle with Maryland tag 6DF5652 ("the Volkswagen SUV").



Individual 10 stopped in a parking space at the McDonald's. At approximately 5:28 p.m., officers observed **HARVEY** (operating the Crown Victoria) drive slowly through the McDonald's parking lot. **HARVEY** exited the parking lot onto Leonardtown Road, and Individual 10 pulled out of the parking lot behind **HARVEY**. Individual 10 followed **HARVEY** to the AutoZone located on Leonardtown Road, and both **HARVEY** and Individual 10 pulled into the AutoZone parking lot, where Individual 10 parked next to **HARVEY**'s vehicle. As an officer drove past **HARVEY** and Individual 10's vehicles, the officer observed **HARVEY** standing outside of the Crown Victoria and Individual 10 getting back into the Volkswagen SUV. Based on the text messages with **DOTSON** and surveillance of **HARVEY** and Individual 10, your affiant believes that **HARVEY** met with Individual 10 to conduct a drug transaction.

162.   On July 8, 2019 at approximately 3:46 p.m., **Target Telephone 1** placed an outgoing call (Call 14435) to 240-377-6157, a phone utilized by **HARVEY**. The following is a partial draft transcript of the conversation between **DOTSON** and **HARVEY**.

> **DOTSON:** Go see, I told what's her name go to Boston Market, Marilyn, you know she gets two, uh, two of the bags, alright?
>
> **HARVEY:** Alright.
>
> **DOTSON:** But don't touch none of that shit, just give her what I say give her bro, honestly.
>
> **HARVEY:** Alright.
>
> **DOTSON:** She gonna have a hundred alright?
>
> **HARVEY:** Alright.
>
> **DOTSON:** So you already kept a hundred and a thirty, alright, now I got to start re-up pretty much, so a hundred dollars.



**HARVEY**:     Alright.

**DOTSON**:     Later, Boston Market, alright.

163.     Your affiant believes that when **DOTSON** told **HARVEY** "Go see, I told what's her name go to Boston Market, Marilyn, you know she gets two, uh, two of the bags," **DOTSON** was directing **HARVEY** to sell fentanyl/heroin ("two of the bags") to Individual 5 ("Marilyn"), a drug customer of **DOTSON**'s. When **DOTSON** told **HARVEY** "you already kept a hundred and a thirty," **DOTSON** was using vague language to tell **HARVEY** that $130 ("a hundred and a thirty") was **HARVEY**'s payment for selling to **DOTSON**'s customers on **DOTSON**'s behalf. Based on this call, surveillance agents were alerted to the pending meeting between **HARVEY** and Individual 5.

164.     At approximately 3:54 p.m., a surveillance officer observed Individual 5 sitting in her blue Nissan in the parking lot of the Boston Market located on Crain Highway, Waldorf Maryland. At approximately 3:57 p.m., the officer observed **HARVEY** arrive in the parking lot operating the Crown Victoria. **HARVEY** parked next to Individual 5 and Individual 5 got out of the Nissan and into the passenger seat of **HARVEY**'s Crown Victoria. Individual 5 immediately got out of **HARVEY**'s Crown Victoria and got back into her car. Both **HARVEY** and Individual 5 then left the parking lot. Based on the call and surveillance, your affiant believes that **HARVEY** distributed fentanyl/heroin to Individual 5 on **DOTSON**'s behalf.

165.     On July 8, 2019 at approximately 7:39 p.m., **Target Telephone 1** placed an outgoing call (Call 14531) to 240-377-6157, a phone utilized by **HARVEY**. The following is a draft transcript of the conversation between **DOTSON** and **HARVEY**.

**HARVEY:**     Hello?

**DOTSON**:    Go to Olive Garden that way you can hit Jamie and him up, one got fifty and one got forty, alright?

**HARVEY**:    So just go to Olive Garden?

**DOTSON**:    Yeah, that way you can do one stop shopping.

**HARVEY**:    Alright.

166.    Your affiant believes that when **DOTSON** told **HARVEY** "go to Olive Garden that way you can hit Jamie and him up, one got fifty and one got forty," **DOTSON** was using coded language to direct **HARVEY** to distribute fentanyl/heroin to two more of **DOTSON**'s customers.

167.    Surveillance officers responded to the Olive Garden restaurant located on Crain Highway, Waldorf, Maryland. At approximately 7:41 p.m., officers observed **HARVEY** (operating the Crown Victoria) pull into the parking lot and park behind the restaurant. At approximately 7:43 p.m., officers observed Individual 11, a frequent drug customer of **DOTSON**'s, pull into the parking lot operating a silver Chrysler 300 sedan and park behind the restaurant. Individual 11 exited his vehicle and briefly got into **HARVEY**'s Crown Victoria. Individual 11 then got out of **HARVEY**'s vehicle and got back into the Chrysler 300, and left the parking lot.

168.    At approximately 7:49 p.m., a white male wearing an Olive Garden uniform walked quickly from the side of the restaurant to **HARVEY**'s Crown Victoria and got into the passenger side. The white male then exited **HARVEY**'s vehicle and walked back to the Olive Garden. **HARVEY** subsequently departed the Olive Garden parking lot. Based on the intercepted call and surveillance, your affiant believes that **HARVEY** met with Individual 11 and the white Olive Garden employee ("Jamie") for a drug transaction.



169.    During the investigation, **HARVEY** has distributed to a number of **DOTSON**'s drug customers on **DOTSON**'s behalf. During the conversation described below, **DOTSON** and **GRAY** discuss **HARVEY**'s role in the organization (using **HARVEY**'s moniker, "Fat Bread").

170.    On July 11, 2019, surveillance officers observed **HARVEY** in the Crown Victoria departing from **Target Location 2**. Officers maintained surveillance of **HARVEY** as he travelled south on Maryland Route 301, across the Harry Nice Bridge, and into Virginia. Officers maintained surveillance of **HARVEY** until he arrived at **Target Location 8**.

171.    On July 12, 2019 at approximately 9:20 a.m., a surveillance officer observed **HARVEY** in the parking lot of **Target Location 8** changing a tire on the Crown Victoria. On July 14, 2019, officers conducted a spot check of **Target Location 8** and observed the Crown Victoria in the parking lot.

172.    On July 20, 2019 beginning at approximately 7:20 a.m., **Target Telephone 2** exchanged the following text messages with 240-377-6157, a phone utilized by **HARVEY**.

| Time | Call Number | Direction | Text Message |
|------|-------------|-----------|--------------|
| 7:20 a.m. | 1123 | Incoming | Hit me when u get up |
| 8:57 a.m. | 1124 | Outgoing | What's goood |
| 8:58 a.m. | 1125 | Incoming | Seeing what time u leaving |
| 8:59 a.m. | 1126 | Outgoing | Soon |
| 9:00 a.m. | 1127 | Incoming | Ok I put the stuff and what was in camper in storage |
| 9:01 a.m. | 1128 | Outgoing | Ok bet wya |
| 9:02 a.m. | 1129 | Incoming | Headed across bridge |
| 9:03 a.m. | 1130 | Outgoing | Which way toward me or to go home |
| 9:05 a.m. | 1131 | Incoming | Home meet u on this side somewhere when u get on this side |
| 9:11 a.m. | 1132 | Outgoing | U get the strap |
| 9:13 a.m. | 1133 | Incoming | In storage in the box of trash bags |
| 9:16 a.m. | 1134 | Outgoing | Ok |



173.   Your affiant believes that when **HARVEY** texted **DOTSON** "I put the stuff and what was in camper in storage," **HARVEY** was using coded language to tell **DOTSON** that he concealed drugs ("stuff") in **DOTSON**'s storage unit. When **DOTSON** texted **HARVEY** "ok bet wya" and **HARVEY** replied "headed across bridge," **HARVEY** was telling **DOTSON** that he was going to **Target Location 8** via the Harry Nice Bridge.

174.   Additionally, when **DOTSON** texted "which way toward me or to go home" and **HARVEY** replied "home meet u on this side somewhere when u get on this side," **HARVEY** was referring to being in Virginia, as **DOTSON** lives in Clinton, Maryland ("towards me") and **HARVEY** resides at **Target Location 8** ("home"). Notably, when **DOTSON** texted "U get the strap" and **HARVEY** replied "in storage in the box of trash bags," your affiant believes that **DOTSON** was referring to a firearm ("strap"), and **HARVEY** had concealed the firearm in **DOTSON**'s storage unit in a box of trash bags.[15]

175.   On July 31, 2019 at approximately 10:05 a.m., **Target Telephone 2** placed an outgoing call (Call 2794) to 240-860-3330, a phone utilized by **GRAY**. The following is a partial draft transcript of the conversation between **DOTSON** and **GRAY**.

> **DOTSON:**   I'm a grab me a motherfucking a white boy, I see what people doing now.
>
> **GRAY:**   Yeah.
>
> **DOTSON:**   I'm a grab me a white boy and a, and a motherfucker like Fat Bread, see, Fat Bread be a good motherfucking candidate, but the only thing about him, he don't smoke or nothing, he don't get high or nothing.

---

[15] The July 20, 2019 communications between **DOTSON** and **HARVEY** about **DOTSON**'s former storage unit confirm for your affiant that **DOTSON** and **HARVEY** are likely using their new storage unit, **Target Location 3**, as a stash location and location to prepare fentanyl/heroin.



**GRAY**: Yeah, he don't get high.

**DOTSON**: He can think for himself a little bit, you feel what I'm saying?

**GRAY**: Yeah. But he really can't though. (Laughs)

**DOTSON**: Yeah you know what I mean though.

**GRAY**: Yeah, I know what you mean.

**DOTSON**: I know what I got to do with Fat Bread, I got to be the one to get the money and just give it to him, like that, and tell him look, I'm gonna give you a hundred and fifty dollars for doing this job.

**GRAY**: Yeah, Yeah.

**DOTSON**: I already know how he is, I'm already on it.

**GRAY**: He not about moving nothing himself.

**DOTSON**: He like a (U/I) anyway so if I can make it a hundred dollars a day, he gonna do whatever I tell him to do.

．．．

**DOTSON**: One thing about Fat Bread, I don't give a fuck what he say, I know he got at least a stack or two put up, she don't know where that's at.

**GRAY**: Sure, he do, sure he do.

176.    Your affiant believes that when **DOTSON** said "I'm a grab me a white boy and a, and a motherfucker like Fat Bread, see, Fat Bread be a good motherfucking candidate, but the only thing about him, he don't smoke or nothing, he don't get high or nothing," **DOTSON** was using vague language to tell **GRAY** that **DOTSON** would like to have a drug runner ("white boy") who has a drug dependency who **DOTSON** can recruit to sell drugs on **DOTSON**'s behalf.

177.    Further, **DOTSON** told **GRAY** that **HARVEY** ("Fat Bread") is a good candidate, but that **HARVEY** does not use drugs ("he don't get high"). When **GRAY** tells **DOTSON** "he not



about moving nothing himself," **GRAY** was referring to **HARVEY** not being motivated to take initiative in distributing drugs and only distributing at **DOTSON**'s direction. When **DOTSON** said "if I can make it a hundred dollars a day, he gonna do whatever I tell him . . . I know he got at least a stack or two put up," **DOTSON** was using vague language to describe how he paid **HARVEY** for distributing drugs at **DOTSON**'s direction, and how **HARVEY** has made some money from **DOTSON** ("a stack or two put up").

### *Tiara Mackall*

178.   Based on a 2016 CCSO investigation of **DOTSON**, your affiant knows that **MACKALL** is a close associate of **DOTSON** and at one point sold heroin/fentanyl on **DOTSON**'s behalf. Beginning on August 5, 2019, **MACKALL** again began distributing heroin/fentanyl and cocaine for **DOTSON**.

179.   On July 30, 2019 at approximately 11:24 a.m., **Target Telephone 1** received an incoming call (Call 9955) from 301-260-5589, a phone utilized by **MACKALL**. The following is a draft transcript of the call between **DOTSON** and **MACKALL**.

> **DOTSON:** Yeah so listen, you know August 5th right? I mean, I'm gonna get straight to the point. August 5th you want to work, right?
>
> **MACKALL:** Mmm, hmmm.
>
> **DOTSON:** Alright, my hours is from nine to six, honestly, lately, three people I been staying open for past six, because they big spenders. Listen, I got a good thing going on man, my phone, honestly I got DK back, you know what I'm saying, I got, I got everything going on a good flow man, I ain't got no fuck ups right now, it's just me for real, I mean I use Cellus, I ain't gonna lie, telling you I use Cellus, but I don't give Cellus my phone. When you work, I'll give you my phone. If I need, I can't have it, you know like, I can't have an, oh, an emergency come up and you say, oh, naw, I need you to at least give me uh, uh, advancement, because if I'm out North Carolina, and then some shit jump off, and you talking about, oh, and then, I'm out, I'm out



losing money youngin', I can't have that. You know what I'm saying?

So, if you gonna work, all I'm saying is, every time that bitch hit two-hundred, that's yours, take it off the top, then start mine then we start, we're even, you feel me? That way your money, you get your shit off the top, we don't got to worry about it, you know what I'm saying? Course, when we on re-up, lets us get the re and then take yours off the top, you know what I'm saying? Listen, we keep a steady flow, we can keep shit going, it's, it's doing about two-thousand or more a day, you know what I'm saying?

I'm just being real. Uh like right now, I ain't even hit nobody cause I want, like and I'll do that periodically, like after a week I won't hit nobody cause I want to see who will hit the phone, you feel me? Without me hitting them. Um, and certain people I do treat different, you know, like Marilyn, you know, she'll get two, two bigs, but again, reason why is because I'm only putting them bitches like point sevens on the bench, you feel me? Point sixes, point seven's, so if she getting two bigs, she only really getting a gram and two, you know what I'm saying? Like a gram. Um, you know you'll get, you'll get the hang of it, like two bigs . . . one-fifty, shit like that you know? Eighty . . . two smalls, shit like that. Um, I'm basically taking off Monday, you feel me? I ain't turning no money down, it's only me, you feel me?

**MACKALL**: Right.

**DOTSON**: Um, it's a steady flow man, you can literally work, wash your clothes, go down Dad's, go chill with your sister and then of course, when you got that phone you keep that bitch on vibrate, I don't want Quetta or none of them in my business yo, I'm telling you that now.

180.   Your affiant believes that when **DOTSON** said "August 5th you want to work, right" and **MACKALL** replied "Mmm, hmmm," **DOTSON** was using vague language to ask **MACKALL** if she wanted to sell drugs for **DOTSON**. **DOTSON** then described his drug trafficking operation to **MACKALL**.

181.   When **DOTSON** said "my hours is nine to six," **DOTSON** was using vague language to tell **MACKALL** the hours of his drug operation. When **DOTSON** said "I got DK back" and "I use Cellus," **DOTSON** was telling **MACKALL** that **Individual 13** (whose initials



are "DK") and **WOODLAND** (whose first name is Marcellus, or "Cellus") were involved in his drug distribution activities. When **DOTSON** said "I don't give Cellus my phone . . . when you work, I'll give you my phone," **DOTSON** was telling **MACKALL** that he would trust **MACKALL** to utilized **Target Telephone 1** to distribute narcotics to his customers.

182.    Your affiant further believes that when **DOTSON** said "if you gonna work, all I'm saying is, every time that bitch hit two-hundred, that's yours, take it off the top, then start mine then we start, we're even, you feel me? That way your money, you get your shit off the top, we don't got to worry about it," **DOTSON** was explaining to **MACKALL** that once she sold drugs to customers and obtained $200, that would be her compensation for distributing on **DOTSON**'s behalf, and any drug sales therefore would constitute **DOTSON**'s profit.

183.    Further, when **DOTSON** said "certain people I do treat different, you know, like Marilyn, you know, she'll get two, two bigs, but again, reason why is because I'm only putting them bitches like point sevens on the bench, you feel me? Point sixes, point seven's, so if she getting two bigs, she only really getting a gram and two, you know what I'm saying? Like a gram. Um, you know you'll get, you'll get the hang of it, like two bigs . . . one-fifty, shit like that you know? Eighty . . . two smalls, shit like that," **DOTSON** was telling **MACKALL** that drug customers like Marilyn (referring to Individual 5) believed they were getting two grams of fentanyl/heroin from **DOTSON**, but that **DOTSON** was actually selling 1.2-gram quantities.

184.    Your affiant knows through surveillance that **DOTSON**, **GRAY** and **MACKALL** met on August 5, 2019 at approximately 10:48 a.m. at the Boost Mobile store located on Crain Highway, Waldorf, Maryland. Your affiant further knows (based on intercepted conversations and text messages occurring over **Target Telephone 1** and surveillance in support of those



interceptions) that **MACKALL** thereafter began using **Target Telephone 1** and selling to **DOTSON**'s drug customers.

185.    On August 9, 2019 beginning at approximately 9:18 a.m., **Target Telephone 1** exchanged the following text messages with 240-299-9966, a phone utilized by Individual 5:

| Time | Call Number | Direction | Text Message |
|------|-------------|-----------|--------------|
| 9:18 a.m. | 14372 | Outgoing | GM new |
| 10:08 a.m. | 14414 | Incoming | Are you available? |
| 10:11 a.m. | 14418 | Outgoing | Yes |
| 10:12 a.m. | 14420 | Outgoing | Go to Walgreens by bannister |
| 10:12 a.m. | 14421 | Outgoing | What u got |
| 10:13 a.m. | 14422 | Incoming | 100 |
| 10:13 a.m. | 14423 | Outgoing | Okay |

186.    Your affiant believes that when **MACKALL** texted "GM new," **MACKALL** was telling Individual 5 in coded language that **MACKALL** had new product for sale. When **MACKALL** text Individual 5 "What you got" and Individual 5 replied "100," Individual 5 was using vague language to tell **MACKALL** that she wanted a $100 quantity of fentanyl/heroin. Surveillance officers were alerted to the pending meeting between **MACKALL** and Individual 5.

187.    At approximately 10:15 a.m., officers observed Individual 5 arrive at the Walgreen's parking lot located on High Street, Waldorf, Maryland, operating a blue Nissan sedan with Maryland tag 4DB9819. At approximately 10:20 a.m., officers observed **MACKALL** arrive in the Walgreen's parking lot operating a blue Nissan Sentra with Maryland tag 2DM4049. **MACKALL** parked directly across from Individual 5's vehicle. Once **MACKALL** parked, Individual 5 exited her vehicle and approached **MACKALL**'s Nissan. Officers then observed Individual 5 walk to the passenger side of **MACKALL**'s vehicle and engage in a hand-to-hand transaction with **MACKALL**.



188.   After the hand-to-hand transaction, officers approached Individual 5 and **MACKALL**. Individual 5 threw a brown napkin on the ground. Officers then secured both Individual 5 and **MACKALL**. An officer recovered the brown napkin Individual 5 threw and found it to contain two small blue plastic bags containing suspected heroin/fentanyl.

189.   Officers conducted a search of **MACKALL**'s vehicle and located in **MACKALL**'s purse a zip-lock bag containing 21 red plastic bags and 13 blue plastic bags of suspected heroin/fentanyl. Officers also located two cellular phones in **MACKALL**'s vehicle, one of which was **Target Telephone 1**. The suspected heroin/fentanyl recovered from **MACKALL** was subjected to a Tru-Narc Thermo Scientific Analyzer field test. The results of the field test were positive for the presence of heroin. The substance weighed approximately 17.7 grams.

190.   At approximately 1:34 p.m., **Target Telephone 2** placed an outgoing call (Call 4496) to 240-860-3330, a phone utilized by **GRAY**. The following is a draft transcript of the conversation between **DOTSON** and **GRAY**.

| | |
|---|---|
| **GRAY**: | Yo. |
| **DOTSON**: | They locked her up bro. |
| **GRAY**: | Goddamn. |
| **DOTSON**: | Fuck they got the phone and everything dog. |
| **GRAY**: | Damn, what the fuck, where she at? |
| **DOTSON**: | Bro, at eleven o'clock, bro, we got to try to figure out, I got to try to figure out, see how I can go to Boost Mobile and get the number and get them numbers. |
| **GRAY**: | Yeah. |
| **DOTSON**: | Somebody had to set her up dog. |

68



**GRAY:**    Yeah.

**DOTSON:**    I know that's what it is bro, I'm telling you that's what it is, somebody set her up. Where you at?

**GRAY:**    I'm at the shop.

**DOTSON:**    Meet me at Boost Mobile, hurry up.

**GRAY:**    Come on, alright.

**DOTSON:**    Cause I got to get the numbers.

**GRAY:**    Yeah we got to hurry up and beat them there.

**DOTSON:**    If anything bro, you got to tell, if anything come about this bro she was working for you, with you, on you, with baby girl, alright?

**GRAY:**    Aw, yeah, yeah, yeah, yeah, with baby girl, I got you.

**DOTSON:**    Bro, we got to move the shit from the spot at least take it to the storage.

**GRAY:**    Come on let's go, let's move.

**DOTSON:**    No, meet me at the storage real fast.

**GRAY:**    Alright.

**DOTSON:**    Grab the box, grab the whole box and meet me at the storage..

**GRAY:**    Alright.

**DOTSON:**    She got locked up with the phone and everything dog.

**GRAY:**    Damn, somebody set her up on the phone.

**DOTSON:**    Yeah, that's why I kept telling her, stop fucking want to, she kept saying get new people. Bro she got all that work on her bro! Fuck! I ain't got nothing!

**GRAY:**    You hear me?



**DOTSON:**    Where you at?

**GRAY:**    Backing up ready to tow.

**DOTSON:**    No, go upstairs and get the box, that's all you got to get the box and meet me at the storage.

**GRAY:**    Yeah that's what I'm talking about.

**DOTSON:**    The new storage.

**GRAY:**    Yeah, I know where you at.

191.    Your affiant believes that when **DOTSON** said "they locked her up bro . . . they got the phone and everything dog," **DOTSON** was referring to **MACKALL**'s arrest and **Target Telephone 1**. When **DOTSON** said "I got to try to figure out, see how I can go to Boost Mobile and get the number and get them numbers," **DOTSON** was telling **GRAY** that he wanted to go to Boost Mobile to retrieve his customers' numbers (that **DOTSON** had saved in **Target Telephone 1**). When **DOTSON** said "if anything come about this bro she was working for you," **DOTSON** was telling **GRAY** that if law enforcement approached **DOTSON**, **GRAY** would have to take the blame and tell law enforcement that **MACKALL** was selling drugs on **GRAY**'s behalf.

192.    Your affiant further believes that when **DOTSON** said "she got all that work on her bro! Fuck! I ain't got nothing," **DOTSON** was telling **GRAY** in coded language that **MACKALL** had **DOTSON**'s drugs in her possession. When **DOTSON** said "go upstairs and get the box, that's all you got to get the box and meet me at the storage," **DOTSON** was instructing **GRAY** to go upstairs in **Target Location 2** ("the shop"), retrieve **DOTSON**'s drugs, and take the drugs to **Target Location 3** ("the storage").



## CONCLUSION

193.    Based on the foregoing evidence, there is probable cause to issue the requested

warrants.

_____
Task Force Officer Mark D. Howard
Drug Enforcement Administration


Subscribed and sworn before me this 14 day of August 2019.

_____
Honorable Charles B. Day
United States Magistrate Judge